$ℋ\!E$

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

KC **FILED**

NOV 2 9 2007
nov 29 2oo7
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

1712 SOUTH PRAIRIE LLC, KARGIL )
DEVELOPMENT PARTNERS LLC, )
KEITH GILES and JERRY KARLIK, )
)
            Plaintiffs, )
)
            v. )
)
HONORABLE ROBERT FIORETTI, )
Individually and in his Official Capacity; *et al.* )

**07CV6703**
**JUDGE COAR**
**MAGISTRATE JUDGE NOLAN**

## NOTICE OF REMOVAL

Defendant City of Chicago Alderman Robert Fioretti ("Defendant" or "Alderman Fioretti"),

by his attorney, Mara S. Georges, Corporation Counsel for the City of Chicago, respectfully removes

the above-entitled action to this Court, pursuant to 28 U.S.C. §§ 1441 and 1446, and in support of

this removal, states as follow:

    1.    Plaintiffs initially filed this civil action on October 25, 2007, in the Circuit Court of

Cook County of the State of Illinois, Chancery Division, Case Number 07 CH 30987, entitled *1712*

*South Prairie LLC, et al. v. Honorable Robert Fioretti, et al.*

    2.    The Complaint includes two causes of action under the United States Constitution

and Federal Statutes, 42 U.S.C. §1983. *See* Plfs.' Compl., Counts I and III, attached hereto as

Exhibit A. Accordingly, Defendant is entitled to remove this action pursuant to 28 U.S.C. § 1441(b),

which provides that "any civil action of which the district courts have original jurisdiction founded

on a claim or right arising under the Constitution, treaties or laws of the United States shall be

removable... ."

    3.    The Complaint originally set forth claims against Alderman Fioretti, the City of

Chicago, and thirteen other alderman in their official capacities. By agreed order dated

November 21, 2007, the claims against all defendants except for Alderman Fioretti were voluntarily dismissed. *See* Agreed Order dated November 21, 2007, attached hereto as Exhibit B.

4.      Service of the Summons and Complaint was made on Defendant Fioretti on October 31, 2007. *See* Summons and Proof of Service, attached hereto as Exhibit C. This notice of removal is therefore timely filed within the thirty-day time period proscribed by 28 U.S.C. § 1446(b), which provides that "[t]he notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based . . ."

5.      Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders served upon Defendant are attached hereto as Exhibits A- I.

6.      Promptly after filing this Notice of Removal, Defendant shall file a copy of such notice with the Clerk of the Circuit Court of Cook County of the State of Illinois, pursuant to 42 U.S.C. § 1446(d).

**WHEREFORE**, Defendant, by this notice, removes the above-described action now pending in the Circuit Court of Cook County, in the State of Illinois, County Department, Chancery Division, No. 07 CH 30987, to this United States District Court for the Northern District of Illinois.

Dated: November 29, 2007                    Respectfully submitted,

                                            MARA S. GEORGES
                                            Corporation Counsel for the City of Chicago

                                            By:_____
                                                Assistant Corporation Counsel

2

Mardell Nereim
William Macy Aguiar
Rebecca Alfert
City of Chicago Department of Law
Constitutional and Commercial Litigation Division
30 N. LaSalle Street, Suite 1230
Chicago, IL 60602
(312)744-6975, 744-4216, 742-0216

# Exhibit A

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| 1712 SOUTH PRAIRIE LLC, KARGIL DEVELOPMENT PARTNERS LLC, KEITH GILES and JERRY KARLIK, | ) ) ) ) | 07CH30987 |
| Plaintiffs, | ) ) | |
| V. | ) ) ) | Case No. |
| HONORABLE ROBERT FIORETTI, Individually and in his Official Capacity; HONORABLE WILLIAM J.P. BANKS, HONORABLE CARRIE M. AUSTIN, HONORABLE BERNARD L. STONE, HONORABLE EDWARD M. BURKE, HONORABLE FRANK J. OLIVO, HONORABLE ISAAC CAROTHERS, HONORABLE LATASHA R. THOMAS, HONORABLE VI DALEY, HONORABLE ED H. SMITH, HONORABLE GENE SCHULTER, HONORABLE REY COLON, HONORABLE RAY SUAREZ, and HONORABLE THOMAS R. ALLEN, All in their Official Capacities as Chairman and Members of the Committee on Zoning, and THE CITY OF CHICAGO, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## VERIFIED COMPLAINT FOR MANDAMUS AND FOR INJUNCTIVE, DECLARATORY AND MONETARY RELIEF

Plaintiffs 1712 South Prairie LLC, Kargil Development Partners LLC, Keith Giles and

Jerry Karlik, by their attorneys, Miller Shakman & Beem LLP, for their Complaint against

Alderman Robert Fioretti, individually and in his official capacity as an Alderman of the City of

Chicago. In addition, in order to insure complete relief and not because of wrongful action by

them, plaintiffs also bring this lawsuit against the Chairman and Members of the Committee on



EXHIBIT
A

Zoning of the City Council of Chicago, each in his or her official capacities only, and the City of Chicago, state as follows:

SUMMARY OF RELIEF SOUGHT

1.      Plaintiffs 1712 South Prairie LLC and Kargil Development Partners LLC are the owner and developer, respectively, of the adjacent parcels of land commonly referred to collectively as 1712 South Prairie Avenue in Chicago (the "Property"), and of the XO Condominium Development (the "Development") proposed to be built at that location.  Plaintiffs Keith Giles and Jerry Karlik are personal guarantors of loans incurred by 1712 South Prairie LLC for purposes of the Developments, which now exceed $19 million.  The plaintiffs have spent the last several years acquiring and developing the Property.  They have obtained all necessary approvals from the City to proceed with the Development.  They have aggressively and successfully taken the project to market, and are on the verge of breaking ground and beginning actual construction.

2.      The plaintiffs bring this action to enjoin Alderman Robert Fioretti from continuing to block a hearing and vote by the Chicago City Council Committee on Zoning on a zoning ordinance proposed by Alderman Fioretti.  That proposed ordinance seeks to revoke the City's approval of the XO Condominium Development.  Alderman Fioretti has invoked a purported right to defer consideration of his proposal and the Zoning Committee has deferred consideration indefinitely.  Alderman Fioretti has thereby prevented the Zoning Committee from acting on his own proposed ordinance.  The pendency of that proposed ordinance is effectively barring the planned development of the Property.  By causing the Zoning Committee to defer action on his own proposal, Alderman Fioretti is depriving plaintiffs of the right to a hearing and Committee vote -- thereby placing plaintiffs' valuable property rights in indefinite suspension.

2

Alderman Fioretti's actions have deprived plaintiffs of their vested rights to develop the Property in accord with its zoning classification and a Plan of Development specifically approved by the Chicago City Council and enacted into law over a year ago.

3.    The plaintiffs have invested millions of dollars and incurred millions more in debt based upon the underlying zoning for the Property, which is consistent with the construction of the XO Condominium Development. Plaintiffs have acted in reliance on the City's prior express approval of the Development. Plaintiff 1712 South Prairie LLC has entered into contracts to sell over 200 units to third-party purchasers. In July 2007, notwithstanding these facts, Alderman Fioretti introduced an amendment to the Chicago Zoning Ordinance that, if enacted, would revoke the City's approval of the Plan of Development (the "Fioretti Revocation Ordinance"). Such action would be invalid and unenforceable under Illinois law because it would cause an illegal infringement on the plaintiffs' vested rights. Revocation of the Plan of Development would be unlawful under *1350 Lake Shore Assoc. v. Healey*, 223 Ill. 2d 607, 861 N.E.2d 944 (2006), and *Furniture L.L.C. v. City of Chicago*, 353 Ill. App. 3d 433, 818 N.E.2d 839 (1st Dist. 2004), among other decisions.

4.    Under applicable law, consideration of the Fioretti Revocation Ordinance is vested with the Zoning Committee of the Chicago City Council ("Zoning Committee"). The Zoning Committee has issued formal notice that it would consider the Fioretti Revocation Ordinance at its meeting on October 25, 2007 and either recommend its enactment or reject it. On October 17, 2007, counsel for the plaintiffs wrote to all members of the Zoning Committee, with a copy to Alderman Fioretti, explaining why the Fioretti Revocation Ordinance was invalid and asking the Zoning Committee to reject it at the October 25 meeting. A copy of that letter is attached as Exhibit A.

5.    On October 18, 2007, after learning that Alderman Fioretti had instructed the Zoning Committee to defer action on his ordinance, counsel for the plaintiffs sent a letter to Alderman Fioretti (copying the Committee members) that described the serious harm plaintiffs were suffering as a result of the pendency of the Fioretti Revocation Ordinance and urging Alderman Fioretti to allow the Committee to act on the ordinance.  A copy of that letter is attached as Exhibit B.  Alderman Fioretti did not withdraw his deferral instruction and the Zoning Committee deferred action on the proposal at its October 25, 2007 meeting.  When counsel for the plaintiffs objected at the October 25, 2007 Zoning Committee meeting, the Chairman of the Committee, Alderman William J.P. Banks, stated that deferral of consideration of the Fioretti Revocation Ordinance was granted solely on the basis of Alderman Fioretti's request, and that such deferral upon the sponsor's request is automatically granted.

6.    By proposing the Fioretti Revocation Ordinance and then preventing action on it by the Zoning Committee, Alderman Fioretti has deprived the plaintiffs of their procedural rights to due process of law and their substantive property rights. The existence of the pending ordinance effectively prevents the plaintiffs from proceeding with the XO Condominium Development at the Property. After Alderman Fioretti proposed the ordinance three months ago, the possibility of its enactment has severely hindered the plaintiffs' efforts to sell condominium units and has made it impossible for plaintiffs to obtain the financing necessary to carry the project forward.  As a result, the plaintiffs are suffering substantial financial losses on a daily basis.

7.    By deferring Zoning Committee action on his own proposed ordinance, Alderman Fioretti has improperly deprived the plaintiffs of a hearing before the Committee.  Alderman Fioretti has acted wholly outside any legitimate legislative role, has acted upon personal malice,

4

has prevented the Committee on Zoning from holding a hearing, and has indefinitely deferred Committee review of the Ordinance.

## THE PARTIES

8.     Plaintiffs 1712 South Prairie LLC and Kargil Development Partners LLC are limited liability companies organized under the laws of Illinois, with their principal places of business in Chicago. Plaintiffs Keith Giles and Jerry Karlik are members of 1712 South Prairie LLC and Kargil Development Partners LLC and have personally guaranteed the bank loans incurred in connection with the XO Condominium Development.

9.     Defendant Alderman Robert Fioretti is the representative to the Chicago City Council from Chicago's Second Ward, in which the XO Condominium Development is located. Alderman Fioretti was elected in April 2007.

10.     Defendant Alderman William J.P. Banks is the Chairman of the Chicago City Council's Committee on Zoning, and defendants Aldermen Carrie M. Austin, Bernard L. Stone, Edward M. Burke, Frank J. Olivo, Isaac Carothers, Latasha R. Thomas, Vi Daley, Ed H. Smith, Gene Schulter, Rey Colon, Ray Suarez and Thomas R. Allen are each members of the Committee on Zoning. These defendants are referred to collectively as the "Zoning Committee Defendants."

11.     Defendant the City of Chicago (the "City") is a municipality organized under Illinois law.

12.     The Zoning Committee Defendants and the City have been joined as defendants in this action not because they have, as of this time, violated the plaintiffs' rights, but because they are necessary parties in order for the plaintiffs to obtain complete relief and. Accordingly, are entitled to an opportunity to be heard on the issues at hand.

5

## THE XO CONDOMINIUM DEVELOPMENT

### Existing Zoning and the Plan of Development

13.     The plaintiffs began their efforts to acquire the Property and develop the XO Condominium Development in the first half of 2005.  At all relevant times, the Property was classified as DX-5 under the Chicago Zoning Ordinance.  The DX-5 zoning classification permitted the plaintiffs' intended use for the Property, which was to construct the XO Condominium Development.

14.     In the summer of 2005, the plaintiffs began discussions of their plans with representatives of the City, including the alderman at the time, Madeline Haithcock, and officials from the Department of Planning.  At all times, the City officials were supportive of the plaintiffs' plans and led the plaintiffs reasonably to conclude that, but for minor revisions, the Development would be approved by the City.

15.     Prior to August 2006, representatives of the City's Department of Planning told the plaintiffs that they could begin marketing the Development as soon as the Plan Commission approved the plans.  The plaintiffs received approval from the Plan Commission in August 2006.

16.     At the plaintiffs' request and after a lengthy process of evaluation by responsible City officials, on or about October 4, 2006, the City Council amended the Chicago Zoning Ordinance to expressly authorize a Plan of Development for the XO Condominium Development at the Property (the "PD").  The PD sets forth a detailed plan for the construction of the Development, which was designed by highly-respected architect Lucien Lagrange.  Pursuant to the PD, the Development can contain up to 571 units housed in two towers, with maximum building heights of 460 and 360 feet, respectively, as well as in accompanying town homes.  A

6

copy of the October 4, 2006 authorizing ordinance, which includes the PD, is attached as Exhibit C.

17.    The PD was properly proposed, reviewed and approved by the City. Prior to the October 4, 2006 vote by the City Council, it was reviewed, commented upon and ultimately supported by area community groups, Alderman Haithcock (Alderman Fioretti's predecessor), the Department of Planning and the Plan Commission. The PD also was reviewed and approved by the Committee on Zoning, and drew no opposition when it was proposed and approved unanimously by the City Council and enacted into law.

Plaintiffs' Reliance on Existing Zoning and the PD

18.    In light of the Property's DX-5 zoning classification, supportive positions taken by City officials, and ultimately the City Council's approval and the City's enactment of the PD, the plaintiffs proceeded with their plans to develop the Property. In reasonable and good faith reliance on the foregoing City actions and approvals, and upon the reasonable understanding that the City would issue any further permits necessary to construct the XO Condominium Development, the plaintiffs made substantial expenditures. Prior to July 19, 2007, the date Alderman Fioretti proposed the Fioretti Revocation Ordinance, the plaintiffs had incurred millions of dollars in architectural, marketing, sales and other expenses that included, among other items, more than $18 million for the purchase of real estate, at least $5.2 million for architectural engineering fees, in excess of $3.2 million to existing tenants of the Property for lease buy-outs and relocation fees, and in excess of $2.5 million in marketing and advertising expenses. Such amounts totaled in excess of $28 million.

19.    In further good faith reliance upon the foregoing City approvals, the plaintiffs marketed the Development and hired employees to assist in a successful sales effort. Between

August 2006 and July 19, 2007, the plaintiffs entered into approximately 200 contracts with third parties for the purchase of units in the XO Condominium Development.

20.    Also in reliance on the foregoing City approvals, including the City's express approval of the PD, the plaintiffs incurred substantial bank debt aggregating in excess of $19 million. In similar good faith reliance, plaintiffs Giles and Karlik personally guaranteed this bank debt. Such debt is presently outstanding, with substantial interest accruing on a daily basis.

21.    The plaintiffs have made reasonable expenditures and incurred obligations in connection with the Development in addition to those listed above, both before and after the introduction of the Fioretti Revocation Ordinance.

22.    Because the plaintiffs substantially changed their position in good-faith reliance on the City's actions and approvals, including the City's express approval of the PD, the plaintiffs have acquired a vested right to construct the XO Condominium Development, consistent with the plans set forth in the PD. Such rights have been recognized by the Illinois Supreme Court and Appellate Court decisions listed in paragraph 3, above. Additionally, under the doctrine of equitable estoppel the plaintiffs have an enforceable legal right to complete the Development as described in the PD and as expressly approved by the City.

The Fioretti Revocation Ordinance

23.    On July 19, 2007, more than nine months after the City Council approved the PD and despite the plaintiffs' vested rights, Alderman Fioretti introduced the Fioretti Revocation Ordinance. A copy of the Fioretti Revocation Ordinance, which has been assigned Application No. A7235 by the Zoning Committee, is attached as Exhibit D.

24.    The Fioretti Revocation Ordinance seeks to amend the Chicago Zoning Ordinance by revoking the PD and therefore would prevent the plaintiffs from constructing the XO

Condominium Development. The Fioretti Revocation Ordinance does not affect any parcel of real estate other than the Property.

25.    Because the plaintiffs have a vested right to construct the XO Condominium Development as described in the approved PD, the Fioretti Revocation Ordinance, if passed by the Zoning Committee and City Council, would be illegal and ineffective. At all relevant times, Alderman Fioretti, who is an experienced lawyer, has known this to be the case.

26.    Despite the illegality and invalidity of the Fioretti Revocation Ordinance, Alderman Fioretti's introduction of that ordinance has deprived the plaintiffs of their vested property right to proceed unhindered with the XO Condominium Development. As long as the Fioretti Revocation Ordinance remains pending before the Committee on Zoning, it has been and will remain impossible for the plaintiffs to obtain the additional financing essential to take the project through construction. Additionally, the existence of the Fioretti Revocation Ordinance has caused a significant drop in sales activity for units in the XO Condominium Development, which further impedes the plaintiffs' ability to complete the Development, and has led existing purchasers to threaten to breach their contractual obligations to deposit additional earnest money.

27.    On July 25, 2007, shortly after the Fioretti Revocation Ordinance was introduced, the plaintiffs provided Alderman Fioretti with a copy of a letter explaining why his ordinance was invalid and illegal,l and describing the substantial harms it had caused and would continue to cause. A copy of that letter, which is addressed to City Corporation Counsel Mara Georges and copied to Alderman Fioretti, is attached as Exhibit E. Alderman Fioretti never responded to it.

Denial of a Hearing on the Fioretti Revocation Ordinance

28.    The Zoning Committee scheduled a hearing and vote on the Fioretti Revocation Ordinance for its October 25, 2007 meeting. The plaintiffs intended to appear at that hearing to

explain their vested right to complete the Development and to ask the Committee to reject the inherently illegal and invalid Fioretti Revocation Ordinance.

29.    On or about October 18, 2007, the plaintiffs learned that Alderman Fioretti had requested that the Committee defer indefinitely any action on the Fioretti Revocation Ordinance.

30.    At the October 25, 2007 meeting of the Zoning Committee, a representative of the plaintiffs appeared and requested that the Committee deny Alderman Fioretti's request for deferral and hold a hearing and vote on the Fioretti Revocation Ordinance. The Chairman of the Committee informed the plaintiffs' representative that the request for deferral by Alderman Fioretti was binding and, therefore, the Committee could not consider the Fioretti Revocation Ordinance.

31.    By causing the Committee to defer action, Alderman Fioretti has denied the plaintiffs the right to be heard on the proposed Fioretti Revocation Ordinance. Despite the fact that the Fioretti Revocation Ordinance had been pending for over three months and that he is aware of its inherent invalidity and the harm it is causing the plaintiffs, Alderman Fioretti caused the Committee to remove the Ordinance from consideration at the October 25, 2007 meeting and has deferred indefinitely any hearing and vote on the Ordinance.

32.    Upon information and belief, in conversations with fellow Aldermen and other City officials, Alderman Fioretti has falsely stated that the plaintiffs have refused to contact or meet with him to discuss the Fioretti Revocation Ordinance and any concerns he may have with the PD. These false statements were made in an apparent attempt to justify his refusal to withdraw a proposed ordinance that is inherently invalid and his decision to prevent the Committee on Zoning from holding its scheduled hearing.

33.     Contrary to Alderman Fioretti's statements, the plaintiffs and their counsel have repeatedly contacted Alderman Fioretti to attempt to discuss the XO Condominium Development, both before and after he proposed the Fioretti Revocation Ordinance. Alderman Fioretti has been largely unresponsive, with the exception of a single preliminary meeting he attended with the plaintiffs' zoning attorney in early October 2007. At the conclusion of that meeting, Alderman Fioretti agreed to contact the zoning attorney again to discuss a possible resolution of the issues raised by his proposed ordinance. He has not done so. Exhibit B hereto accurately summarizes occasions on which the plaintiffs and their representatives have unsuccessfully attempted to discuss the Fioretti Revocation Ordinance with Alderman Fioretti.

34.     Were the Fioretti Revocation Ordinance to be passed by the Zoning Committee and enacted, the plaintiffs could and would seek an immediate judicial determination that it is void and invalid. Alternatively, if the Fioretti Revocation Ordinance were rejected by the Zoning Committee, the cloud it has placed on the Development, which has prevented the plaintiffs from proceeding, would be removed. By deferring Committee consideration, however, Alderman Fioretti has prevented either outcome.

## COUNT I: PROCEDURAL DUE PROCESS
(Brought under 42 U.S.C. § 1983 for Violation of 14th Amendment, U.S. Constitution)

35.     The plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1-34 as their allegations for this paragraph 35 of Count I.

36.     The Due Process Clause of the 14th Amendment to the United States Constitution prohibits any deprivation of a protectable property interest without notice and hearing.

37.    Under Illinois law, the plaintiffs have a vested and protectable property interest in developing the Property consistent with the PD as approved by the City Council in October 2006.

38.    The Fioretti Revocation Ordinance proposed by Alderman Fioretti has deprived the plaintiffs of that property interest, and will continue to deprive them of that property interest as long as the ordinance remains pending before the Zoning Committee. The Fioretti Revocation Ordinance effectively and foreseeably prevents the plaintiffs from proceeding with construction of the XO Condominium Development as previously approved by all relevant City of Chicago authorities.

39.    By causing the Zoning Committee to defer action upon his own proposed ordinance, Alderman Fioretti has denied plaintiffs any hearing for this ongoing deprivation of their property rights and interests.

40.    The unwarranted and ongoing delay of the Development resulting from Alderman Fioretti's proposal and the indefinite deferral of the Fioretti Revocation Ordinance has caused and continues to cause direct and substantial financial harm to the plaintiffs, including but not limited to the accrual of interest on the substantial bank debt already incurred and the loss of sales.

41.    If the plaintiffs are not granted injunctive relief that enjoins Alderman Fioretti from interfering with a prompt hearing on the Fioretti Revocation Ordinance before the Zoning Committee and the City Council, and the proposed ordinance is allowed to remain in limbo indefinitely, the plaintiffs will continue to suffer irreparable harm for which they will have no adequate legal remedy.  Such harm includes, but is not limited to, continued lost sales, loss of standing in the market, loss of financing, and the possible failure of the XO Condominium

12

Development. The benefit to the plaintiffs of granting the limited injunction sought herein vastly outweighs any harm to Alderman Fioretti that such injunctive relief will cause.

42.    Alderman Fioretti's actions in introducing a plainly invalid proposed ordinance and then deferring indefinitely Zoning Committee consideration of it, thereby denying the plaintiffs a hearing, are baseless and unauthorized. Such acts have no legitimate legislative or administrative purpose. Alderman Fioretti's actions were targeted toward plaintiffs and undertaken with malice. He knew or should have known that his conduct would violate their constitutional due process rights. He undertook the actions with the intention of causing further injury to the plaintiffs and causing the deprivation of their constitutional and property rights.

43.    Because the rezoning of a single property constitutes an administrative action, Alderman Fioretti's conduct does not enjoy legislative immunity. Even if a qualified immunity might otherwise have applied, such immunity is lost because Alderman Fioretti has acted with malice in causing the Zoning Committee to not consider or act upon his own proposed ordinance, after he was advised of the harm to the plaintiffs resulting from his actions.

WHEREFORE, the plaintiffs request that this Court:

(i)  enter preliminary and permanent injunctive relief barring Alderman Fioretti from taking any further steps to prevent or delay the Zoning Committee or the City Council from holding a hearing and vote on the Fioretti Revocation Ordinance;

(ii)  enter preliminary and permanent injunctive relief barring Alderman Fioretti from taking any further action to interfere with or impede the plaintiffs' construction of the Development, including asserting objections to or withholding consent for any permits, licenses or other customary relief routinely granted by the Plan Commission and required to complete construction of the Development consistent with the PD.

(iii)  enter preliminary and permanent injunctive relief directing the Zoning Committee Defendants to hold a enter preliminary and permanent injunctive relief barring Alderman Fioretti from taking any further action to interfere with or impede the plaintiffs' construction of the Development, including asserting objections to or withholding consent for any permits, licenses or other customary relief routinely granted by the plan

commission and required to complete construction of the Development consistent with the PD.hearing and to vote on the Fioretti Revocation Ordinance at its next scheduled meeting, currently set for November 20, 2007;

(iv)   award the plaintiffs the monetary damages they have suffered as a result of Alderman Fioretti's deprivation of their procedural due process rights;

(v)   award the plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

(vi)   award such other relief as the Court deems just and proper.

## COUNT II: PROCEDURAL DUE PROCESS
(Violation of Art. I, § 2, Illinois Constitution)

44.   The plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1-43 as their allegations for this paragraph 44 of Count II.

45.   Like its counterpart in the Federal Constitution, the Due Process Clause of the Illinois Constitution prohibits deprivation of a protectable property interest without notice and hearing.

46.   The deprivation of the plaintiffs' procedural due process rights under the 14th Amendment to the United States Constitution, as set forth in Count I above, also constitutes a deprivation of the plaintiffs' procedural due process rights under Art. I, § 2 of the Illinois Constitution.

47.   As set forth in Count I, Alderman Fioretti's actions have caused damages, as well as ongoing and irreparable harm that warrants entry of injunctive relief. Alderman Fioretti is not entitled to any immunity from the plaintiffs' claims for damages caused by his intentional and malicious violations of the plaintiffs' constitutional rights.

WHEREFORE, the plaintiffs request that this Court:

(i)   enter preliminary and permanent injunctive relief barring Alderman Fioretti from taking any further steps to prevent or delay the Zoning Committee or the City Council from holding a hearing and vote on the Fioretti Revocation Ordinance;

(ii)   enter preliminary and permanent injunctive relief barring Alderman Fioretti from taking any further action to interfere with or impede the plaintiffs' construction of the Development, including asserting objections to or withholding consent for any permits, licenses or other customary relief routinely granted by the Plan Commission and required to complete construction of the Development consistent with the PD.

(iii)   enter preliminary and permanent injunctive relief directing the Zoning Committee Defendants to hold a hearing and a vote on the Fioretti Revocation Ordinance at its next scheduled meeting, currently set for November 20, 2007;

(iv)   award the plaintiffs the monetary damages they have suffered as a result of Alderman Fioretti's deprivation of their procedural due process rights; and

(v)   award such other relief as the Court deems just and proper.

## COUNT III: SUBSTANTIVE DUE PROCESS
(Brought under 42 U.S.C. § 1983, for Violation of 14th Amendment, U.S. Constitution)

48.   The plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1-47 as their allegations for this paragraph 48 of Count III.

49.   The Due Process Clause of the 14th Amendment to the United States Constitution prohibits deprivation of a protectable property interest by government action that is arbitrary and capricious.

50.   As alleged above, the plaintiffs have a vested and protectable property interest in completing the XO Condominium Development.   The Fioretti Revocation Ordinance has deprived the plaintiffs of that interest.

51.   Alderman Fioretti's introduction of an ordinance that he knew or should have known to be inherently invalid, yet that would harm the plaintiffs' protectable property interests, constituted an arbitrary, capricious and irrational act with no substantial relation to the public health, morals, safety or welfare.

52.    Alderman Fioretti's further action in deferring consideration of his invalid and harmful proposed ordinance by the Zoning Committee has deprived plaintiffs of any hearing and extended the deprivation of their property interests.    Such action constituted an arbitrary, capricious and irrational act with no substantial relation to the public health, morals, safety or welfare.

53.    As set forth in Count I, Alderman Fioretti's actions have caused monetary damages, as well as ongoing and irreparable harm that warrants entry of injunctive relief. Alderman Fioretti is not entitled to any immunity from the plaintiffs' claims for damages caused by his intentional and malicious violations of the plaintiffs' constitutional rights

WHEREFORE, the plaintiffs request that this Court:

(i)   enter preliminary and permanent injunctive relief barring Alderman Fioretti from taking any further steps to prevent or delay the Zoning Committee from holding a hearing and vote on the Fioretti Revocation Ordinance;

(ii)   enter preliminary and permanent injunctive relief barring Alderman Fioretti from taking any further action to interfere with or impede the plaintiffs' construction of the Development, including asserting objections to or withholding consent for any permits, licenses or other customary relief routinely granted by the Plan Commission and required to complete construction of the Development consistent with the PD.

(iii)   enter preliminary and permanent injunctive relief directing the Zoning Committee Defendants to hold a hearing and a vote on the Fioretti Revocation Ordinance at its next scheduled meeting, currently set for November 20, 2007;

(iv)   award the plaintiffs the monetary damages they have suffered as a result of Alderman Fioretti's deprivation of their substantive due process rights;

(v)   award the plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

(vi)   award such other relief as the Court deems just and proper.

## COUNT IV: SUBSTANTIVE DUE PROCESS
(Violation of Art. I, § 2, Illinois Constitution)

54.    The plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1-53 as their allegations for this paragraph 54 of Count IV.

55.    Like its counterpart in the Federal Constitution, the Due Process Clause of the Illinois Constitution prohibits any deprivation of a protectable property interest caused by government action that is arbitrary and capricious.

56.    The deprivation of the plaintiffs' substantive due process rights under the 14th Amendment to the United States Constitution, as set forth in Count III above, also constitutes a deprivation of the plaintiffs' substantive due process rights under Art. I, § 2 of the Illinois Constitution.

57.    As set forth in Counts I and III, Alderman Fioretti's actions have caused monetary damages, as well as ongoing and irreparable harm that warrants entry of injunctive relief. Alderman Fioretti is not entitled to any immunity from the plaintiffs' claims for damages caused by his intentional and malicious violations of the plaintiffs' constitutional rights.

WHEREFORE, the plaintiffs request that this Court:

(i)    enter preliminary and permanent injunctive relief barring Alderman Fioretti from taking any further steps to prevent or delay the Zoning Committee or the City Council from holding a hearing and vote on the Fioretti Revocation Ordinance;

(ii)    enter preliminary and permanent injunctive relief barring Alderman Fioretti from taking any further action to interfere with or impede the plaintiffs' construction of the Development, including asserting objections to or withholding consent for any permits, licenses or other customary relief routinely granted by the Plan Commission and required to complete construction of the Development consistent with the PD..

(iii)    enter preliminary and permanent injunctive relief directing the Zoning Committee Defendants to hold a hearing and a vote on the Fioretti Revocation Ordinance at its next scheduled meeting, currently set for November 20, 2007;

(iv)   award the plaintiffs the monetary damages they have suffered as a result of Alderman Fioretti's deprivation of their procedural due process rights; and

(v)   award such other relief as the Court deems just and proper.

### COUNT V: DECLARATORY JUDGMENT
(Brought under 735 ILCS 5/2-701)

58.    The plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1-57 as their allegations for this paragraph 58 of Count V.

59.    The plaintiffs' vested rights to develop the Property consistent with the PD approved by the City Council constitutes a valid, legal tangible interest.

60.    Alderman Fioretti has introduced, and refused to withdraw, the Fioretti Revocation Ordinance, which seeks to deprive the plaintiffs of their vested rights. Therefore, he has an interest that opposes the plaintiffs' tangible legal and property interest. Alderman Fioretti has taken the position that the plaintiffs do not have vested rights to proceed with the XO Condominium Development as approved.

61.    Alderman Fioretti has refused requests from the plaintiffs and others that he withdraw the inherently invalid Fioretti Revocation Ordinance.

62.    The plaintiffs are suffering substantial and ongoing harm from Alderman Fioretti's introduction of, and refusal to withdraw, the Fioretti Revocation Ordinance, including, but not limited to, the loss of sales, the daily cost of carrying millions of dollars in bank debt while the Development is effectively stalled, the loss of additional financing opportunities, and lost standing in the market. The plaintiffs' harms have been compounded by Alderman Fioretti's actions in indefinitely deferring consideration of the Fioretti Revocation Ordinance by the Zoning Committee or the City Council.

63.     The plaintiffs' request for a judicial determination of their vested rights to proceed with the XO Condominium Development presents a concrete dispute admitting of an immediate and definitive determination of the parties' rights.  The resolution of these rights will aid in the termination of this dispute.

WHEREFORE, the plaintiffs request that this Court:

(i) enter a declaration pursuant to 735 ILCS 5/2-701 that the plaintiffs have a vested right to proceed with the XO Condominium Development as approved by the City Council in the PD and that any effort to revoke the PD, including the Fioretti Revocation Ordinance, would be void and unenforceable, if passed and signed into law;

(ii) award such other relief as the Court deems just and proper.

## COUNT VI: MANDAMUS
(Brought in the Alternative to Claims for Injunctive Relief)

64.     The plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1-63 as their allegations for this paragraph 64 of Count VI.

65.     As set forth in Counts I through V, the introduction and indefinite deferral of the Fioretti Revocation Ordinance deprives the plaintiffs of their procedural and substantive due process rights under the United States and Illinois Constitutions and of their vested rights under Illinois law.

66.     The due process clauses of both Constitutions require the defendants to provide the plaintiffs with a hearing on the deprivation of their protectable property interests caused by the introduction and indefinite deferral of the Fioretti Revocation Ordinance.

67.     Alderman Fioretti's introduction of an inherently invalid, harmful ordinance and his actions in depriving the plaintiffs of any hearing on that ordinance were arbitrary, capricious and irrational and motivated by malice.

68.    The plaintiffs have demanded that Alderman Fioretti withdraw the Fioretti Revocation Ordinance or, in the alternative, that he allow the Zoning Committee to provide a prompt hearing and vote on the Ordinance.   Alderman Fioretti has not complied with either demand.

69.    It is within the power of Alderman Fioretti to withdraw his direction to the Zoning Committee to defer consideration of the Fioretti Revocation Ordinance.  It is within the power of the Zoning Committee Defendants to provide a prompt hearing and vote on the Fioretti Revocation Ordinance, and it is their duty to do so.

WHEREFORE, the plaintiffs request that this Court:

(i)   enter a writ of mandamus compelling Alderman Fioretti to withdraw any deferral requests, holds or other impediments to the prompt consideration of the Fioretti Revocation Ordinance by the Zoning Committee or the City Council;

(ii)  enter a writ of mandamus compelling the Zoning Committee Defendants to hold a hearing and a vote on the Fioretti Revocation Ordinance at their next scheduled meeting, currently set for November 20, 2007; and

(iii)  award such other relief as the Court deems just and proper.

Dated: October 25, 2007

Respectfully submitted,

By: _____
One of the plaintiffs' attorneys

Michael L. Shakman
Daniel M. Feeney
Fredrick E. Vars
MILLER SHAKMAN & BEEM LLP (90236)
180 N. LaSalle St. Suite 3600
Chicago, IL 60601
(312) 263-3700

<u>VERIFICATION</u>

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters stated therein to be on information and belief, and as to such matters, the undersigned certifies as aforesaid that he verily believes the same to be true.

Jerry Karlik, Individually and as Authorized Representative of 1712 South Prairie LLC and Kargil Development Partners LLC

# MILLER SHAKMAN & BEEM LLP

ATTORNEYS AND COUNSELORS

180 NORTH LASALLE STREET
SUITE 3600
CHICAGO, ILLINOIS 60601
TELEPHONE (312) 263-3700
FAX (312) 263-3270
October 17, 2007

WRITER'S DIRECT LINE

(312) 759-7246

**VIA MESSENGER**
Alderman William J.P. Banks
Chairman, Committee on Zoning
The Chicago City Council
121 North LaSalle Street
Room 304
Chicago, IL 60602

**VIA OVERNIGHT MAIL/FACSIMILE**
Alderman William J.P. Banks
36th Ward Office
6839 West Belmont Avenue
Chicago, IL 60634

Re:     *App. A7235, Proposed Revocation of Plan of Development for 1712 South Prairie*

Dear Chairman Banks:

I am writing on behalf of our clients, 1712 South Prairie LLC and Kargil Development Partners LLC, the owner and developer, respectively, of the real estate located at 1712 South Prairie Avenue in the south loop and of the XO Condominium development. The development is the subject of proposed ordinance Application Number A7235 currently pending before the Committee on Zoning. In recent meetings with representatives of the Mayor's Office and the Department of Planning and Development, neither group has expressed any support for this ordinance.

The proposed ordinance seeks to revoke a Plan of Development for 1712 South Prairie that was passed by the City Council more than a year ago. In reliance upon the previously approved Plan of Development, our clients have spent tens of millions of dollars and sold hundreds of units to Chicagoans who want to live in the XO Condominium development. Our clients' right to develop the property in a manner consistent with the Plan of Development has vested. The proposed ordinance would effectively revoke the PD. Under controlling Illinois case law discussed below, such action would be illegal and ineffective.

Disapproving the XO development retroactively at this very advanced stage would also set a very unfortunate precedent that will discourage other real estate development in Chicago. Developers, lenders, purchasers and suppliers are all entitled to operate on the understanding that City Council approval of a planned development, after extensive consideration by the Department of Planning, the Zoning Committee and others in City government, can be relied upon. The proposed ordinance places that reliance in jeopardy for this development and any

MILLER SHAKMAN & BEEM LLP

Alderman William J.P. Banks
October 17, 2007
Page 2

other that has received formal City Council approval, based on which the developer and third-parties have made substantial personal and economic commitments.

    We urge the Committee to vote to reject Application A7235.

Background.

    On October 4, 2006, after prior approval by this Committee, the City Council amended the Chicago Zoning Ordinance to expressly authorize a Plan of Development for 1712 South Prairie (the "PD"). The PD set forth a detailed plan for the construction of a residential development containing 571 units housed in two towers and accompanying town homes. A copy of the October 4, 2006 authorizing ordinance is attached.

    The PD was the product of an extended dialog between the owners and developers of the project, the surrounding community and the City. After several modifications to accommodate input from community residents and the Planning Department, the PD that was placed before this Committee and the City Council drew no opposition. To the contrary, the measure was actively supported by two area community groups and the sitting alderman for the 2nd Ward, Madeline Haithcock. The PD passed in the City Council by a unanimous vote.

    Relying on the City Council's direct approval of the PD, our clients have proceeded with the development of 1712 South Prairie. Since the PD was passed 12 months ago, they have incurred millions of dollars in architectural, marketing, sales and other expenses, and have hired employees to engage in an active and successful sales effort. They have incurred (and continue to carry) nearly $20 million in bank debt, with substantial interest accruing on a daily basis. In addition, the project has successfully proceeded to market, with over 200 units under contract with third-party purchasers, representing almost $100 million in sales. Many of these purchasers are current residents of the South Loop who expect to move into this development in their neighborhood, and have made their own plans on the correct understanding that the project had been approved by the City and would be built.

Controlling Legal Principles.

    Our clients were troubled to learn of the ordinance proposed by Alderman Fioretti, Application Number A7235. In light of the advanced stage of the development efforts at 1712 South Prairie and our clients' substantial change in position undertaken in good faith reliance on the Council's approval of the PD, they have acquired a vested legal right to build the development as previously approved. Illinois Appellate Court decisions upholding the rights of developers in similar circumstances include 1350 Lake Shore Assoc. v. City of Chicago, 223 Ill. 2d 607, 861 N.E.2d 944, 950 (2006), and Furniture L.L.C. v. City of Chicago, 353 Ill. App. 3d

MILLER SHAKMAN & BEEM LLP

Alderman William J.P. Banks
October 17, 2007
Page 3

433, 818 N.E.2d 839, 848 (1st Dist. 2004). In those cases, the courts found that property owners who had incurred significant costs in beginning a real estate development project in reliance on existing zoning were entitled to complete the projects, despite a subsequent decision by the City to change the zoning or disapprove of the plans.

The efforts of Kargil Development and 1712 South Prairie have progressed well beyond those of the developer found to have acquired a vested right in Furniture L.L.C. In that case, the developer had expended $900,000 in acquiring the property and preparing initial architectural plans. Furniture L.L.C., 818 N.E.2d at 847. Our clients have spent millions of dollars on architectural, marketing and sales efforts, millions more acquiring the property, have incurred nearly $20 million in debt, and, unlike the plaintiff in Furniture L.L.C., have actually taken the project to market, with well nearly 200 buyers expecting to purchase units and to move into the development. From these facts, it is clear that any effort to repeal the PD would be legally ineffective, and would face certain defeat in court.

## Impact of the Proposed Ordinance.

Repeal of the PD at this time would impact the lives and businesses of hundreds of individuals. Beyond the developer and owner and their many employees, the cancellation of the development that would result from the proposed ordinance would adversely affect the nearly 200 buyers who have committed to purchase units, and the brokers who have participated in the existing sales. In addition, construction of a project of this size will involve dozens of contractors and subcontractors, and employ hundreds of skilled tradesmen for a substantial period. That valuable economic activity and its collateral benefits for the City will be lost.

Enacting the proposed ordinance would set a very negative precedent for property owners and developers in the City. When a developer commits time, substantial funds and personnel to a large scale development like the XO Condominium, the developer needs to know that he and his investors, lenders and customers can rely on formal, carefully-considered City approvals that have been obtained for the development. Without that confidence, development efforts in the City inevitably will be discouraged. Until the recent submission of Application Number A7235, it was widely understood that when the City Council affirmatively approves a detailed Plan of Development, the approval can be relied upon. If approval of a PD is uncertain and temporary, as enactment of A7235 would suggests, developers will be discouraged from pursuing developments that are in the interest of the City and its citizens. The fact that an aldermanic seat has changed hands, and the new alderman has a different view of the merits of an approved development, is not a proper or legally permissible reason to treat prior City Council action upon which third parties have relied as provisional and subject to change.

MILLER SHAKMAN & BEEM LLP

Alderman William J.P. Banks
October 17, 2007
Page 4

The proponents of Application A7235 have expressed concern over the height and density of the project approved in the PD. Our clients do not believe that these concerns are well-founded. But the time for consideration of such issues with respect to the XO Condominium development is long since past. All the issues now raised by the proponents of A7235, and many more, were raised and discussed in the process that led to the final version of the PD. This Committee and the City Council considered those issues and found the PD worthy of approval. The process was thorough, fair and complete. It should not be repeated.

On behalf of 1712 South Prairie LLC and Kargil Development Partners LLC, we respectfully ask that the Committee reject the proposed ordinance.

Sincerely,

Daniel M. Feeney

DMF/tml

cc:    Alderman Robert W. Fioretti (via facsimile)

# MILLER SHAKMAN & BEEM LLP

ATTORNEYS AND COUNSELORS

180 NORTH LASALLE STREET
SUITE 3600
CHICAGO, ILLINOIS 60601
TELEPHONE (312) 263-3700
FAX (312) 263-3270

October 18, 2007

WRITER'S DIRECT LINE

(312) 759-7246

**VIA MESSENGER**
Alderman Robert Fioretti
121 North LaSalle Street
Room 300, Office 02
Chicago, Illinois 60602

Dear Alderman Fioretti:

I am writing on behalf of our clients, 1712 South Prairie LLC and Kargil Development Partners LLC, the owner and developer, respectively, of the parcel of land located 1712 South Prairie Avenue in the south loop that is far along in the development process for construction of the XO Condominium development. As you are aware, in July you introduced a proposed zoning ordinance amendment, Application Number A7235, which is currently scheduled to be heard by the Committee on Zoning at its October 25, 2007 meeting. That amendment, if approved by the Committee and the City Council, would effectively block the XO Condominium development despite prior approvals for the development, and would violate our clients' vested legal rights to proceed with the development as previously approved by the City.

We learned today that you have requested that consideration of your ordinance be deferred. We have also been told that you have said to other Aldermen and the Office of Intergovernmental Affairs that our clients and their representatives have refused to discuss with you your objections to the XO development.

Your statements, if they have been accurately reported to us, are untrue and wholly inconsistent with our clients' action. Our clients and their lawyers have repeatedly made themselves available over the past three months to discuss with you your proposed ordinance and a possible resolution of this matter, as follows:

- Keith Giles, one of our clients' principals, met with you on July 13 to discuss the XO Condominium project, days before you proposed your ordinance. At the conclusion of that meeting, you agreed to visit the sales center, review the project and contact Mr. Giles for further discussions after you had met with the one neighborhood group that opposes the development. Mr. Giles has not heard from you since.

MILLER SHAKMAN & BEEM LLP

Alderman Robert Fioretti
October 18, 2007
Page 2

- On July 25, 2007, shortly after you submitted the ordinance, we forwarded to you a copy of a letter from our firm to Mara Georges setting forth the law and facts showing that our clients have a vested right to complete the project consistent with the existing and formally approved plan of development. I followed that letter with a telephone call to your office on July 27, 2007, and left a message with one of your staff members asking you to please return my call and expressing our hope that the matter could be resolved. You never returned my call.

- On October 4, 2007, after you had rescheduled earlier dates, Langdon Neal, the zoning lawyer for our clients, met with you in person to discuss your ordinance. Mr. Neal expressed our clients' openness to resolving this matter, and you agreed at the conclusion of the meeting to contact him to continue the discussion after you had had an opportunity to further consider the matter. You have not contacted Mr. Neal to follow up.

- Yesterday, we learned for the first time (through an intermediary) that you wanted our clients to contact you directly, rather than through their attorneys. Accordingly, Mr. Giles promptly contacted your office yesterday afternoon and left a message requesting that you contact him to discuss your ordinance. He has not heard back from you.

On July 25, 2007 we wrote Mara Georges, the Corporation Counsel, outlining our clients' legal and factual position. As noted above, a copy of that letter was provided to you on that same date. Neither Ms. Georges, you or any other representative of the City has disputed our clients' position, as set forth in that that letter, that they are legally entitled to rely upon the existing zoning approvals for the XO Condominium development, and that your proposed ordinance would be legally ineffective if adopted. Representatives of the City have informally told us and our clients that they agree with our clients' position and recognize that your action has exposed the City to the potential of significant liability to our clients.

In an effort to end the uncertainty about the XO Condominium development that your actions have created, on October 17, 2007 we wrote you and all the members of the Zoning Committee describing the history of our clients' efforts to develop the XO Condominium, the prior City approvals and the case law that affords them the right to rely upon the prior approvals to proceed with the development. We urged them to vote in opposition to your proposed amendment at the October 25 Zoning Committee meeting. Subsequently, you apparently sought to put the Committee's consideration of your own proposed amendment in suspended animation, thus avoiding Committee action and continuing the cloud under which your action has placed the XO Condominium development.

MILLER SHAKMAN & BEEM LLP

Alderman Robert Fioretti
October 18, 2007
Page 3

Despite the fact that your proposed ordinance would be legally invalid if it were passed, your action has created a perception of uncertainty concerning the XO Condominium development that has caused, and is continuing to cause, substantial and ongoing harm to our clients on a daily basis.

In view of our clients' repeated efforts to discuss the project, and your proposed ordinance amendment, with you over a period of several months, without any response by you, we can only conclude that your present effort to further delay Zoning Committee consideration of this three-month old proposed ordinance is an intentional effort to prejudice our clients and to cause further harm. It is not a legitimate exercise of any purported legislative right or duty.

Our clients remain available to meet with you, day or night, between now and October 25. You may contact me, Langdon Neal or Keith Giles to arrange a meeting. To avoid compounding the damage caused to our clients, the proposed ordinance should remain on the agenda for the October 25 meeting of the Committee on Zoning, and be presented for an up or down vote at that time.

To that end, we request that you immediately withdraw any request you have made to continue or defer consideration of the proposed ordinance at the October 25 Committee meeting. Our clients are entitled to be heard by the Committee and to have the Committee act on your proposed ordinance, one way or the other. Inaction is unjustified and harmful to our clients, who have placed millions of dollars and thousands of hour of work at risk in reliance on prior formal City approvals of the XO Condominium development and the zoning upon which it is premised. It is also harmful and unfair to the almost 200 purchasers who have signed agreements to buy units in the XO Condominium and are entitled to proceed in reliance on the legally valid understanding that the City had fully approved the zoning upon which the development is premised.

Our clients' objective remains a prompt resolution of this matter that takes into account our clients' vested rights to complete the XO Condominium project as described in the approved plan of development and approved zoning. Our clients reserve their right to protect their interests through litigation, if necessary, including the right to seek recovery from you, in your individual capacity, for all monetary losses caused by the proposal, including for additional unwarranted delay you have or may generate in consideration of your proposed ordinance amendment. We believe your actions have gone well beyond any legislative privilege that might exist for good faith legislative proposals, and that you are now acting based upon personal motivations, for which you may be held liable in damages. See, Lonzo v. City of Chicago, 461 F. Supp. 2d 661, 664-65 (N.D. Ill. 2006); Chicago Miracle Temple Church, Inc. v. Fox, 901 F. Supp. 1333, 1343-44 (N.D. Ill. 1995).

MILLER SHAKMAN & BEEM LLP

Alderman Robert Fioretti
October 18, 2007
Page 4


        Any further delay in Zoning Committee consideration of your proposed amendment will
increase the damages for which our clients will seek recovery.

        I look forward to your prompt response.

                                        Sincerely,

                                        Daniel M. Feeney

DMF/tml

cc:     Honorable William J.P. Banks
        Members of the Committee on Zoning
        Joan Coogan, Department of Intergovernmental Affairs
        Mara Georges, Corporation Counsel

SECTION 1. Title 17 of the Municipal Code of Chicago, the Chicago Zoning Ordinance, is hereby amended by changing all the DX-5 Downtown Mixed-Use District symbols and indications as shown on Map Number 4-E in the area bounded by:

a line 547.13 feet north of and parallel to East 18th Street; South Prairie Avenue; East 18th Street; and the alley next west of and parallel to South Prairie Avenue,

to those of a Residential Planned Development which is hereby established in the area described, subject to such use and bulk regulations as are set forth in the Planned Development herewith attached and made a part hereof and to no others.

SECTION 2. This ordinance shall be in force and effect from and after its passage and due publication.

Plan of Development Statements referred to in this ordinance read as follows:

*Residential Planned Development Number* _____.

*Plan Of Development Statements.*

1.  The area delineated herein as a Residential-Business Planned Development ("Planned Development") consists of approximately ninety-seven thousand two hundred seven (97,207) square feet (two and twenty-three hundredths (2.23) acres) of net site area which is depicted on the attached Planned Development Boundary Plan and Right-of-Way Plan. The property is controlled by the applicant, 1712 South Prairie, L.L.C.

2.  The applicant ("Applicant") shall obtain all applicable official reviews, approvals or permits which are necessary to implement this Planned Development. Any dedication or vacation of streets or alleys, or easements, or adjustments of right-of-way, or consolidation or resubdivision of parcels, shall require a separate submission on behalf of the Applicant or its successors, assignees or grantees and approval by the Chicago City Council.

3.  The requirements, obligations and conditions contained within this Planned Development shall be binding upon the Applicant, its successors and assigns, grantees and Lessees, and, if different than the Applicant, the legal titleholders or any ground lessors. All rights granted hereunder to the Applicant shall inure to the benefit of the Applicant's successors and assigns and, if different than the Applicant, the legal titleholder

or any ground lessors. Furthermore, pursuant to the requirements of Article 17-8-0400 of the Chicago Zoning Ordinance, the property, at the time applications for amendments, modifications or changes (administrative, legislative or otherwise) to this Planned Development are made, shall be under single ownership or under single designated control. Single designated control for purposes of this paragraph shall mean that any application to the City for any amendment to this Planned Development or any other modification or change thereto (administrative, legislative or otherwise) shall be made or authorized by all the owners of the property and any ground lessors, or by a governmental agency with the power of eminent domain which has designated the property for acquisition. An agreement among property owners, the board of directors of any property owners association, or covenant binding property owners, may designate the authorized party for any future amendment, modification or change. The Applicant shall retain single designated control and shall be deemed to be the authorized party for any future amendment, modification or change until the Applicant shall designate in writing the party or parties authorized to make application for any future amendment, modification or change.

4.  This plan of development consists of the following twenty (20) statements; a Bulk Regulations and Data Table; an Existing Zoning Map; a Planned Development Boundary and Property Line Map; Site Plan; Landscape Plan; and East, South, West and North Conceptual Building Elevations prepared by Lucien LaGrange Architects, dated August 17, 2006; and resolution of the City of Chicago Commission on Chicago Landmarks, dated June 1, 2006. Full-size sets of the Site Plan, Landscape Plan and Conceptual Building Elevations are on file with the Department of Planning and Development. The Planned Development is applicable to the area delineated herein and these and no other zoning controls shall apply. The planned development conforms to the intent and purpose of the Chicago Zoning Ordinance, Title 17 of the Municipal Code of Chicago, and all requirements thereof and satisfies the established criteria for approval as a Planned Development. In any instance where a provision of the Planned Development conflicts with the Chicago Building Code, the Building Code shall control.

5.  The uses permitted within the area delineated herein as a "Residential Planned Development" shall include residential, recreational, accessory parking and related uses.

6.  The Applicant agrees that the public will not be prohibited access to the landscaped garden or open spaced located at the northwest corner of East 18th Street and South Prairie Avenue. The Applicant, successors and or assigns reserve the right to post signage on the landscaped garden or open space designating the hours that the space will be open to the public.

7.  The Applicant acknowledges and discloses to all purchasers and owners of dwelling units in residential buildings (the "Premises") within this Planned Development, and their successors and assigns, that other buildings may be constructed on properties surrounding these Premises, and such buildings may obscure views from dwelling unit windows of these Premises.

8.  Identification and temporary signs, including temporary construction signs and marketing signs, may be permitted within the area delineated herein as a "Residential Planned Development", subject to the review and approval of the Department of Planning and Development.

9.  Three (3) off-street loading facilities for deliveries will be provided within this Planned Development. All parking utilized within this Planned Development will be associated with the residential and related uses. This plan is subject to the review of the Departments of Transportation and Planning and Development.

10. Ingress and egress shall be subject to the review and approval of the Department of Transportation -- Bureau of Traffic and the Department of Planning and Development. All work in the public way must be designed and constructed in accordance with the Chicago Department of Transportation Construction Standards for Work in the Public Way and in compliance with the Municipal Code of the City of Chicago. Closure of all or part of any public streets or alleys during demolition or construction shall be subject to the review and approval of the Chicago Department of Transportation.

11. In addition to the maximum height of the buildings and any appurtenances thereto prescribed in this Planned Development, the height of any improvement shall also be subject to height limitations as approved by the Federal Aviation Administration.

12. The maximum permitted floor area ratio ("F.A.R.") shall be in accordance with the attached Bulk Regulations and Data Table. For purposes of F.A.R. calculations and floor area measurements, the definitions in the Chicago Zoning Ordinance shall apply.

13. The improvements on the property shall be designed, installed and maintained in substantial conformance with the Site Plan, Landscape Plan and Building Elevations and in accordance with the parkway tree provisions of the Chicago Zoning Ordinance and corresponding regulations and guidelines. The Applicant shall install appropriately designed and scaled street lights along the South Prairie Avenue and East 18th Street frontages of the property. The street lights shall be selected with the approval of the Department of Planning and Development and the

Department of Streets and Sanitation Bureau of Electricity, and installed with the approval of the Bureau of Electricity.

14.  The permitted floor area ratio ("F.A.R.") identified in the Bulk Regulations and Data Table has been determined using a Net Site Area of ninety-seven thousand two hundred seven (97,207) square feet, a base F.A.R. of five and zero-hundredths (5.00) and additional F.A.R. for a series of proposed amenities, as follows:

| Description | Floor Area Ratio |
|---|---|
| Base Floor Area Ratio | 5.00 |
| Affordable Housing Bonus | 1.00 |
| Adopt-a-Landmark Bonus | 1.00 |
| Total Floor Area Ratio | 7.00 |

15.  Pursuant to the Affordable Housing Provision of the City of Chicago Zoning Ordinance, Title 17, Chapter 17-4-1004, et seq. ("Zoning Ordinance") the Applicant has asked for an increase in the Floor Area Ratio of the property. The Applicant hereby acknowledges that according to Section 17-4-1004D of the Zoning Ordinance, the total floor area devoted to affordable housing units must equal at least twenty-five percent (25%) of the total increase in floor area allowed under the Affordable Housing Bonus or a cash payment must be made to the City of Chicago Affordable Housing Opportunity Fund based on the increase in allowable floor area multiplied by eighty percent (80%) of the median cost of land per buildable square foot. Based on Section 17-4-1004D the Applicant has agreed to provide a cash payment to the City of Chicago Affordable Housing Opportunity Fund in the amount of Six Hundred Ninety-nine Thousand Eight Hundred Ninety-nine Dollars ($699,899). Prior to the issuance of permits, the Applicant will enter into an Affordable Housing Agreement with the Chicago Department of Housing or provide a letter of credit or other security device in an amount equal to the cash contribution. The Applicant must comply with all of the applicable sections of the Affordable Housing Provision of the Zoning Ordinance which sections are hereby incorporated into this Planned Development. The Affordable Housing Agreement required by Section 17-4-1004-E9 is also incorporated into this Planned Development.

16.  Pursuant to the Adopt-a-Landmark provision of the Chicago Zoning Ordinance, Title 17 Chapter 17-4-1022, et seq. ("Zoning Ordinance") the

Applicant has asked for an increase in the Floor Area Ratio of the property. The Applicant hereby acknowledges that according to Section 17-4-1022-B of the Zoning Ordinance, floor area bonuses may be granted in return for payments to property owner of officially designated historic buildings to support specific building restoration projects. Section 17-4-1022-C-1 states that floor area bonuses for qualifying activities are to be based on financial contributions that reflect the value of property within the geographic area, based on the following formula: Cost of one (1) square foot of floor area equals eighty percent (80%) multiplied by median cost of land per buildable square foot. Based on Section 17-4-1022-C-1, the Applicant has agreed to make cash contribution to the Glessner House, which is an officially designated historic building, in the amount of Six Hundred Ninety-nine Thousand Eight Hundred Ninety-nine Dollars ($699,899).

Pursuant to the provisions of Section 17-4-1022 of the Chicago Zoning Ordinance, the Commissioner of the Department of Planning and Development acting on behalf of the City of Chicago and the Commission on Chicago Landmarks is authorized to enter into an agreement with the Glessner House Museum, the owner of the John J. Glessner House and a Chicago landmark located at 1800 South Prairie Avenue (the "Landmark Project"), regarding the manner in which the funds for the renovation work in the Landmark Project, as approved by the Commission on Chicago Landmarks on June 1, 2006, will be used. The agreement shall be in a form approved by the Corporation Counsel. A separate agreement between the Glessner House Museum and the Applicant regarding the transfer, administration and use of the funding to be provided by the Applicant for the Landmark Project shall also be in a form approved by the Corporation Counsel. Both agreements shall be executed and submitted as part of the Part II submission to the Department of Planning and Development. The terms and conditions of the Landmark Project scope of the work and budget may be modified administratively by the Commissioner of the Department of Planning and Development in accordance with the provisions of Statement 12 of this Planned Development. Upon completion of the work related to the Landmark Project, the Applicant shall apply to the Commission on Chicago Landmarks for the issuance of a Certificate of Completion of the Landmark Project.

17.    The Applicant acknowledges that it is in the public interest to design, construct and maintain all buildings in a manner that promotes and maximizes conservation of natural resources. The Applicant shall use best and reasonable efforts to design, construct and maintain all buildings located within the subject property in a manner generally consistent with the Leadership in Energy and Environmental Design ("L.E.E.D.") Green Building Rating System. Copies of these standards may be obtained from the Department of Planning and Development. Additionally, Applicant

shall provide a green roof identified on the Landscape Plan. The green roof shall be at least twenty-five percent (25%) of the net roof area.

18. The Applicant acknowledges that it is in the public interest to design, construct and maintain the building and all other improvements in a manner that promotes, enables and maximizes universal access throughout the subject property. Plans for all buildings and improvements on the subject property shall be reviewed and approved by the Mayor's Office for People with Disabilities ("M.O.P.D.") to ensure compliance with all applicable laws and regulations related to access for persons with disabilities and to promote a high standard of accessibility. No building permit shall be issued by the Department of Construction and Permits until the Director of M.O.P.D. has approved detailed construction drawings for the building or improvement proposed.

19. The terms, conditions and exhibits of this Planned Development ordinance may be modified administratively by the Commissioner of the Department of Planning and Development upon the application for such a modification by the Applicant and after a determination is made by the Commissioner of the Department of Planning and Development that such a modification is minor, appropriate and consistent with the nature of the improvements contemplated in this Planned Development and the purposes underlying the provisions hereof. Any such modification of the requirements of this Planned Development by the Commissioner of the Department of Planning and Development shall be deemed to be a minor change in the Planned Development as contemplated by Section 17-13-0611 of the Chicago Zoning Ordinance.

20. Unless substantial construction has commenced within six (6) years following adoption of this Residential Planned Development, and unless completion is thereafter diligently pursued, then this Planned Development shall expire; and the zoning of the property shall automatically revert to the prior DX-5 Downtown Mixed-Use District.

[Existing Zoning Map; Planned Development Boundary and Property Line Map; Site Plan; Landscape Plan; North, South, East and West Building Elevations referred to in these Plan of Development Statements printed on pages 88457 through 88464 of this *Journal*.]

Bulk Regulations and Data Table referred to in these Plan of Development Statements reads as follows:

*Residential Planned Development Number* \_\_\_\_\_.

*Plan Of Development.*

*Bulk Regulations And Data Table.*

| | |
|---|---|
| Gross Site Area: | 121,790 square feet (2.93 acres) |
| Net Site Area: | 97,207 square feet (2.23 acres) = Gross Site Area (127,790 square feet) - Area remaining in adjacent public streets and alleys (36,583 square feet) |
| Maximum Floor Area Ratio (F.A.R.): | |
| Base F.A.R.: | 5.0 |
| Affordable Housing Bonus: | 1.0 |
| Adopt-a-Landmark Bonus: | 1.0 |
| Total F.A.R.: | 7.0 |
| Permitted Uses: | residential, recreational, accessory parking and related uses. |
| Maximum Number of Dwelling Units: | 571 |
| Minimum Number of Off-Street Parking Spaces: | 586 (1.13:1 parking ratio) |
| Minimum Number of Bicycle Spaces: | 1:2 automobile spaces; maximum 50 required |
| Minimum Number of Loading Berths: | 3 at 10 feet width by 25 feet length by 14 feet height |
| Maximum Site Coverage: | In accordance with the Site Plan |
| Minimum Periphery Setbacks: | In accordance with the Site Plan |
| Maximum Building Height: | 460 feet |

Existing  Zoning  Map.



EXISTING HISTORICAL
STRUCTURE
(GLESSNER HOUSE)

APPLICANT; 1710 SOUTH PRAIRIE LLC
ADDRESS: 1636-1726 SOUTH PRAIRIE AVENUE
1600 TO 1800 EAST 16TH STREET
DATE: APRIL 24, 2006
REVISED. AUGUST 17, 2006

PD 01 _ EXISTING ZONING MAP

LUCIEN LAGRANGE
ARCHITECTS

88458          JOURNAL--CITY COUNCIL--CHICAGO          10/4/2006

Planned  Development  Boundary
And  Property  Line  Map.



10/4/2006          REPORTS OF COMMITTEES          88459

Site Plan.



Landscape Plan.



10/4/2006            REPORTS OF COMMITTEES            88461

North Elevation.



88462          JOURNAL--CITY COUNCIL--CHICAGO          10/4/2006

South Elevation.



10/4/2006          REPORTS OF COMMITTEES          88463

East Elevation.



88464          JOURNAL--CITY COUNCIL--CHICAGO          10/4/2006

West Elevation.



## ORDINANCE

**SECTION 1.** Title 17 of the Municipal Code of Chicago, the Chicago Zoning Ordinance, is hereby amended by changing all of the Residential Planned Development No. 1033 symbols and indications as shown on Map Number 4-E in the area bounded by:

a line 547.13 feet north of and parallel to East 18th Street; South Prairie Avenue; East 18th Street; and the alley next west of and parallel to South Prairie Avenue,

to those of a DX-5, Downtown Mixed-Use District.

**SECTION 2.** The Plan of Development Statements and Use and Bulk Regulations set forth in Residential Planned Development No. 1033 previously approved by the City Council of the City of Chicago on October 4, 2006, are hereby repealed.

**SECTION 3.** This ordinance takes effect after its passage and approval.

Robert W. Fioretti
Alderman, 2nd Ward

Common Address:    1712 South Prairie Avenue

Document No. PO2007- 5341

REFERRED TO COMMITTEE ON
ZONING

JUL 18 2007

City Clerk

City of Chicago

# MILLER SHAKMAN & BEEM LLP

ATTORNEYS AND COUNSELORS

180 NORTH LA SALLE STREET
SUITE 3600
CHICAGO, ILLINOIS 60601
TELEPHONE (312) 263-3700
FAX (312) 263-3270

July 25, 2007

WRITER'S DIRECT LINE

312-759-7250

By Messenger
For Settlement Purposes Only

Mara S. Georges
Corporation Counsel
City of Chicago
Room 600
City Hall
Chicago, IL 60602

Re:    Proposed Revocation of Plan of Development for 1712 South Prairie

Dear Mara:

As Dan Feeney informed Jeff Levine of your office on Monday, we have been retained by 1712 South Prairie LLC and Kargil Development Partners LLC, the owner and developer, respectively, of the parcel of land located in the South Loop on Prairie Avenue, just north of 18th Street (the "Kargil Property"). On October 4, 2006, the City Council amended the Chicago Zoning Ordinance to expressly authorize a Plan of Development for the Kargil Property (the "PD"). The PD set forth a detailed plan for the construction of a residential development containing 571 units housed in two towers and accompanying town homes. A copy of the October 4, 2006 authorizing ordinance is enclosed.

In good faith and reasonable reliance on the City Council's direct approval of the PD, our clients have proceeded with the development of the Kargil Property. In doing so, they have substantially changed their position, including incurring millions of dollars in architectural, marketing, sales and other expenses. In addition, our clients have incurred (and continue to carry) nearly $20 million in bank debt, with substantial interest accruing on a daily basis. The project has successfully proceeded to market, with nearly 200 units under contract with third-party purchasers representing about $100 million in revenues.

Given the above, our clients were extremely troubled to learn of the ordinance proposed by Alderman Fioretti last Thursday, which seeks to repeal the PD. (A copy of the proposed ordinance also is enclosed.) In light of the advanced stage of the development efforts at the Kargil Property, and our clients' substantial change in position undertaken in good faith and reasonable reliance on

MILLER SHAKMAN & BEEM LLP

Mara S. Georges
Page 2
July 25, 2007

the Council's approval of the PD, they have acquired a vested legal right to build the development as previously approved.  See 1350 Lake Shore Assoc. V. City of Chicago, 223 Ill. 2d 607, 861 N.E.2d 944, 950 (2006); Furniture L.L.C. v. City of Chicago, 353 Ill. App. 3d 433, 818 N.E.2d 839, 848 (1ˢᵗ Dist. 2004).  The efforts of Kargil Development and 1712 South Prairie have progressed well beyond those of the developer found to have acquired a vested right in Furniture L.L.C.  In that case, the developer had expended $900,000 in acquiring the property and preparing initial architectural plans.  Furniture L.L.C., 818 N.E.2d at 847.  By contrast, our clients have spent millions of dollars on architectural, marketing and sales efforts, millions more acquiring the property, incurred nearly $20 million in debt, and, unlike the plaintiff in Furniture L.L.C., have actually taken the project to market.  From these facts, it is clear that any effort to repeal the PD would be legally ineffective.

Despite the obvious unenforceability of the proposed repeal, Alderman Fioretti's pending ordinance – and the press it has received – is damaging our clients on a daily basis.  Since the ordinance was proposed last week, the sales office has received many inquiries regarding the future of the project and prospective purchasers have expressed a hesitancy to enter into contracts in light of the perceived uncertainty of the development.  Accordingly, we request that the Ordinance be withdrawn immediately and this cloud on the Kargil project removed.

Our clients request a prompt resolution of this matter.  However, if that is not obtainable, we will have no choice but to take the necessary steps to protect our clients' interests to prevent any further harm.

If you have any questions or require additional information, please contact me or Dan Feeney (759-7246).  I would appreciate a prompt response.

Sincerely,

Michael L. Shakman

MLS:ra

cc:     Alderman Robert W. Fioretti
        Jeffrey C. B. Levine

# Exhibit B

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| 1712 SOUTH PRAIRIE LLC, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| V. | ) | Case No. 07 CH 30987 |
| | ) | |
| HONORABLE ROBERT FIORETTI, | ) | |
| Individually and in his Official Capacity; et al. | ) | |
| | ) | |
| Defendants. | ) | |

## <u>AGREED ORDER</u>

This matter being heard by agreement of the plaintiffs and the ~~appearing~~ defendants, it is hereby ordered that:
*identified below*

1.    The plaintiffs' Emergency Motion for Preliminary Injunction and Accelerated Discovery is withdrawn;

2.    The claims asserted in the plaintiffs' Verified Complaint for Mandamus and for Injunctive, Declaratory and Monetary Relief are voluntarily dismissed solely as to the following defendants: the City of Chicago, Aldermen William J.P. Banks, Carrie M. Austin, Bernard L. Stone, Edward M. Burke, Frank J. Olivo, Isaac Carothers, Latasha R. Thomas, Vi Daley, Ed H. Smith, Gene Schulter, Rey Colon, Ray Suarez and Thomas R. Allen, all sued in their official capacities.

3.    *This matter is set for status on Dec. 6, 2007 at 10:00 a.m.*

Dated: _____          ENTERED:

                                        _____
                                        Judge Kathleen Pantle

Prepared By:
Daniel M. Feeney, Attorney for Plaintiffs
Miller Shakman & Beem LLP, No. 90236
180 North LaSalle Street, Suite 3600
Chicago, IL 60601
(312) 263-3700



EXHIBIT
B

# Exhibit C

## CERTIFICATE OF SERVICE

The undersigned attorney, upon oath, hereby certifies that a copy of the foregoing **Proof of Service** and **Notice** thereof, was served upon the named party(ies) listed below, addressed aforesaid, **via messenger service,** on the 1st day of **November, 2007.**

> **Mardell Nereim**
> **Bill Aguire**
> **Chief Assistant Corporation Counsel**
> **Constitutional & Commercial Litigation Division**
> **CITY OF CHICAGO LAW DEPT.**
> **30 North LaSalle Street**
> **Room 1230**
> **Chicago, IL  60602**
>
> **Honorable Robert Fioretti**
> **CITY HALL**
> **121 North LaSalle Street**
> **Room 300, Office 02**
> **Chicago, IL 60602**

Michael L. Shakman
Daniel M. Feeney
MILLER SHAKMAN & BEEM LLP
180 North La Salle Street - Suite 3600
Chicago, IL 60601
Atty. No. 90236
Telephone:    (312) 263-3700
Facsimile:     (312) 263-3270

**EXHIBIT**

**C**

**ClientCaseID:**    DAN FEENEY
**Law Firm ID:**    MILLERSH



*1 6 7 1 6 9 A *

**CaseReturnDate:**    11/24/07

**Affidavit of Special Process Server**

## COOK COUNTY CIRCUIT COURT, STATE OF ILLINOIS

Case Number **07CH30987**

I, TODD MARTINSON

FIRST DULY SWORN ON OATH STATES THAT I AM OVER 18 YEARS OF AGE AND NOT A PARTY TO THIS SUIT AND IS A REGISTERED EMPLOYEE OF ILLINOIS DEPARTMENT OF PROFESSIONAL REGULATION PRIVATE DETECTIVE AGENCY #117-001292 STERN PROCESS & INVESTIGATION LLC 205 W. RANDOLPH ST. #1210 CHICAGO IL 60606

## PERSONAL SERVICE

THAT I SERVED THE WITHIN    **SUMMONS AND COMPLAINT**

ON THE WITHIN NAMED DEFENDANT    **ALDERMAN ROBERT FIORETTI**

BY LEAVING A COPY OF EACH WITH THE SAID DEFENDANT PERSONALLY    **10/31/07**

That the sex, race and approximate age of the person whom I left the    **SUMMONS AND COMPLAINT**
are as follow:    **Sex** MALE    **Race** WHITE    **Age** 55

**Height** 5' 10"    **Build** MEDIUM    **Hair** BROWN

LOCATION OF SERVICE    **121 N LASALLE ST CHAMBERS
CHICAGO, IL, 60602**

Date Of Service    **10/31/07**        Time of Service    **9:38 AM**

*Todd M Martinson*        10/31/2007
TODD MARTINSON

**Special Process Server**
DETECTIVE #115-002035

Under penalties of perjury as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statement are true and correct, except as to matters therein stated to be on information and belief and such matters the undersigned certifies as aforesaid that he/she verily believes same to be true.

*Todd M Martinson*

# Exhibit D

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT – CHANCERY DIVISION

1712 S. Prairie LLC etal.  )
        Vs.           )     No. _07 CH 35987_
Hon. Robert Fioretti et al.  )
                  )

The above-entitled and numbered cause having been previously assigned to

Judge _Sophia Hall_ , Chancery Calendar # _____, said Judge having

___4311___ ☒  granted a change of Judge.

___8211___ ☐  recused himself/herself.

For the following reason: _As of right, per motion of plaintiff 1712_
_S. Prairie LLC_

___4282___    It is hereby transferred to Judge Dorothy Kirie Kinnaird, Presiding Judge of the Chancery Division for the purpose of reassigning said cause.

                                                    OCT 26 2007

                    _____
                    Judge                     Judge's No.

___8202___    IT IS HEREBY ORDERED that the above-entitled cause is hereby forwarded to DOROTHY BROWN, Clerk of the Circuit Court of Cook County for reassignment. IT IS FURTHER ORDERED that said Clerk shall draw a new calendar number by random electronic process from the category bank designated in the original pleading.

                                        _____
                                        DOROTHY KIRIE. KINNAIRD No. 276
                                        PRESIDING JUDGE
                                        CHANCERY DIVISION

**EXHIBIT**

**D**

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

# Exhibit E

Case 1:07-cv-06703   Document 1   Filed 11/29/2007   Page 66 of 109

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| 1712 SOUTH PRAIRIE LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 07 CH 30987 |
| | ) | |
| HONORABLE ROBERT FIORETTI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF EMERGENCY MOTION

**TO:  Mara S. Georges, Esq., Corporation Counsel – Law Dept., City Hall, 121 North
LaSalle Street, Room 600, Chicago, IL 60602
Honorable Robert Fioretti, City Hall, 121 North LaSalle Street, Office 02, Chicago, IL 60602**

**PLEASE TAKE NOTICE** that on the **30th day of October, 2007, at 10:45 a.m.,** or as soon thereafter as counsel may be heard, we shall appear before the **Honorable Kathleen Pantle,** or any other judge sitting in his/her stead, in the courtroom usually occupied by him/her in **Room 2410** of the Richard J. Daley Center in Chicago, Illinois, and shall then and there present the attached **Plaintiffs' Emergency Motion for Preliminary Injunction and Accelerated Discovery,** a copy of which is hereby served upon you.

Respectfully submitted,

By: _____
Attorneys for Plaintiffs

Michael L. Shakman, Esq.
Daniel M. Feeney, Esq.
MILLER SHAKMAN & BEEM LLP
180 North La Salle Street – Suite 3600
Chicago, IL 60601
Atty. No. 90236
Telephone:    (312) 263-3700
Facsimile:    (312) 263-3270



EXHIBIT
E

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| 1712 SOUTH PRAIRIE LLC, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| V. | ) Case No. 07 CH 30987 |
| | ) |
| HONORABLE ROBERT FIORETTI, et al. , | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION
AND ACCELERATED DISCOVERY**

Plaintiffs 1712 South Prairie LLC, Kargil Development Partners LLC, Keith Giles and

Jerry Karlik, by their attorneys Miller Shakman & Beem LLP, respectfully request that this Court

enter an order:

(a) enjoining defendant Alderman Robert Fioretti from taking any further steps to prevent or delay the Zoning Committee of the Chicago City Council or the City Council itself from holding a hearing and voting on the ordinance that Alderman Fioretti proposed on July 19, 2007 and which has been assigned Application No. A7235 (the "Fioretti Revocation Ordinance");

(b) directing the defendant members of the Zoning Committee to hold a hearing and a vote on the Fioretti Revocation Ordinance at the Committee's next scheduled meeting, currently set for November 20, 2007;

(c) setting this motion for a hearing and ruling before November 20, 2007; **and**

(d) authorizing accelerated discovery.

In support of this motion, the Plaintiffs state as follows:[1]

1. Plaintiffs 1712 South Prairie LLC and Kargil Development Partners LLC are the

owner and developer, respectively, of the adjacent parcels of land commonly referred to

collectively as 1712 South Prairie Avenue in Chicago (the "Property"), and of the XO

---

[1] All facts contained herein are supported by the Verified Complaint and by the accompanying affidavit of Keith Giles.

Condominium Development (the "Development") proposed to be built at that location. The plaintiffs have spent the last several years acquiring and developing the Property. They have obtained all necessary approvals from the City, have aggressively and successfully taken the project to market, have sold 200 units, incurred over $28 million in obligations, and are on the verge of breaking ground and beginning actual construction. At this late stage in the project, Alderman Fioretti has introduced the Fioretti Revocation Ordinance, which attempts to rescind the City's past express approval of the Development and prevent the plaintiffs from completing the project. Apart from Alderman Fioretti, the plaintiffs have not heard any other Alderman or City official express support for the Fioretti Revocation Ordinance.

2.     By this motion, the plaintiffs seek limited and narrow injunctive relief: only an order that will require a prompt hearing and an up or down vote by the Chicago City Council Committee on Zoning (the "Zoning Committee") on the Fioretti Revocation Ordinance. The proposed ordinance seeks to revoke the City's October 4, 2006 Plan of Development (the "PD"), in which the City expressly approved the XO Condominium Development. Alderman Fioretti has prevented the Zoning Committee from acting on his own proposal by requesting and obtaining an indefinite deferral on October 25. The plaintiffs seek an injunction barring him from interfering any further with the Committee's consideration of his own proposed ordinance.

3.     The introduction and continued pendency of the Fioretti Revocation Ordinance has deprived the plaintiffs of their legal right under well-established Illinois case law to proceed with the XO Condominium Development.   As long as the proposed ordinance is pending, the plaintiffs will remain substantially hindered in their efforts to sell units, unable to finalize construction contracts and unable to obtain construction financing.   By causing the Zoning Committee indefinitely to defer action on his own proposal, Alderman Fioretti has deprived

2

plaintiffs of the right to a hearing on the deprivation of their property rights effected by the proposed ordinance – thereby violating the plaintiffs' substantive and procedural due process rights under the United States and Illinois Constitutions. The plaintiffs seek an injunction that will direct Alderman Fioretti to cease his interference with the Zoning Committee and allow that body to provide the plaintiffs with the due process hearing to which they are entitled.[2]

FACTS

Existing Zoning and the Plan of Development

4.      The plaintiffs began their efforts to acquire the Property and develop the XO Condominium Development in the first half of 2005. At all relevant times, the Property was classified as DX-5 under the Chicago Zoning Ordinance. The DX-5 zoning classification permitted the plaintiffs' intended use for the Property, which was to construct the XO Condominium Development. In the summer of 2005, the plaintiffs began discussing their plans with representatives of the City, including the Second Ward alderman at the time, Madeline Haithcock, and officials from the Department of Planning. At all times, the City officials were supportive of the plaintiffs' plans and led the plaintiffs reasonably to conclude that, but for minor revisions, the Development would be approved by the City. Prior to August 2006, representatives of the City's Department of Planning told the plaintiffs that they could begin marketing the Development as soon as the Plan Commission approved the plans. The plaintiffs received approval from the Plan Commission in August 2006.

---

[2] The defendant members of the Zoning Committee, who have been sued in their official capacities only, and the City of Chicago have been joined as defendants in this action not because they have, as of this time, violated the plaintiffs' rights, but because they are necessary parties in order for the plaintiffs to obtain complete relief, and, accordingly, are entitled to an opportunity to be heard on the issues at hand.

3

5.      On or about October 4, 2006, at the plaintiffs' request and after a lengthy process of evaluation by responsible City officials, the City Council amended the Chicago Zoning Ordinance to expressly authorize a Plan of Development for the XO Condominium Development at the Property.  The PD sets forth a detailed plan for the construction of the Development, which was designed by highly-respected architect Lucien Lagrange.  Pursuant to the PD, the Development can contain up to 571 units housed in two towers, with maximum building heights of 460 and 360 feet, respectively, as well as in accompanying town homes.  The approved plans also provide that the Development will contain a public park and other amenities.  A copy of the October 4, 2006 authorizing ordinance, which includes the PD, is attached to the Verified Complaint as Exhibit C.

6.      The PD was properly proposed, reviewed and approved by the City.  Prior to the October 4, 2006 vote by the City Council, it was reviewed, commented upon and ultimately supported by area community groups, Alderman Haithcock (Alderman Fioretti's predecessor), the Department of Planning and the Plan Commission.  The PD also was reviewed and approved by the Committee on Zoning, and drew no opposition when it was proposed and approved unanimously by the City Council and enacted into law.

Plaintiffs' Reliance on Existing Zoning and the PD

7.      In light of the Property's DX-5 zoning classification, supportive positions taken by City officials, and ultimately the City Council's approval and the City's enactment of the PD, the plaintiffs proceeded with their plans to develop the Property.  In reasonable and good faith reliance on the foregoing City actions and approvals, and upon the reasonable understanding that the City would issue any further permits necessary to construct the XO Condominium Development, the plaintiffs made large financial commitments and substantial expenditures.

4

Prior to July 19, 2007, the date Alderman Fioretti proposed the Fioretti Revocation Ordinance, the plaintiffs had incurred millions of dollars in architectural, marketing, sales and other expenses that included, among other items, more than $18 million for the purchase of real estate, at least $5.2 million for architectural and engineering fees, in excess of $3.2 million to existing tenants of the Property for lease buy-outs and relocation fees, and in excess of $2.5 million in marketing and advertising expenses. Such amounts totaled in excess of $28 million.

8.      In further good faith reliance upon the foregoing City approvals, the plaintiffs marketed the Development and hired employees to assist in a successful sales effort. Between August 2006 and July 19, 2007, the plaintiffs entered into approximately 200 contracts with third parties for the purchase of units in the XO Condominium Development. The plaintiffs incurred substantial bank debt aggregating in excess of $19 million. Plaintiffs Giles and Karlik personally guaranteed this bank debt. Such debt is presently outstanding, with substantial interest accruing on a daily basis. The plaintiffs have made reasonable expenditures and incurred obligations in connection with the Development in addition to those listed here, both before and after the introduction of the Fioretti Revocation Ordinance.

The Fioretti Revocation Ordinance

9.      On July 19, 2007, more than nine months after the City Council approved the PD and after the plaintiffs had incurred approximately $28 million in expenses and debt in connection with the Development, Alderman Fioretti introduced the Fioretti Revocation Ordinance. A copy of the Fioretti Revocation Ordinance is attached to the Verified Complaint as Exhibit D. The Fioretti Revocation Ordinance seeks to amend the Chicago Zoning Ordinance by revoking the PD. If enacted, the proposed ordinance would prevent the plaintiffs from constructing the XO Condominium Development. However, because the plaintiffs have a vested

right to construct the XO Condominium Development and because the City is equitably estopped from rescinding the PD (see discussion in ¶¶ 17-21, below), the Fioretti Revocation Ordinance, if passed by the Zoning Committee and City Council, would be illegal and ineffective. At all relevant times, Alderman Fioretti, who is an experienced lawyer, knew or should have known this to be the case.

10.    Despite the illegality and invalidity of the Fioretti Revocation Ordinance, its introduction has deprived the plaintiffs of their vested property right to proceed with the XO Condominium Development. The mere proposal of the Ordinance received immediate and substantial press coverage calling into question the viability of the XO Condominium Development. See Alby Gallun, Proposed Zoning Chage Threatens South Loop Project, ChicagoBusiness.Com, July 20, 2007 (attached as Ex. 1 hereto); Hayley Graham, Ordinance Could Downsize X/O, Chicago Journal, July 26, 2007, at 1 (attached as Ex. 2); David Roeder, New Aldermen in Nuke Mode, Chicago Sun-Times, July 25, 2007, at 57 (attached as Ex. 3). The effects have been substantial. As long as the Fioretti Revocation Ordinance remains pending before the Zoning Committee, it has been and will remain impossible for the plaintiffs to obtain the construction financing that is essential to complete the project. The plaintiffs have been harmed in negotiating with construction contractors, who now question whether the City will allow the Development to be built. The cloud the Fioretti Revocation Ordinance has cast over the Development has severely damaged the project's standing with condominium purchasers and has caused a significant drop in sales activity. In addition, some existing purchasers have threatened to breach their contractual obligations to deposit additional earnest money, citing the proposed ordinance.

11.    On July 25, 2007, shortly after the Fioretti Revocation Ordinance was introduced, the plaintiffs provided Alderman Fioretti with a copy of a letter from their lawyer explaining why his proposed ordinance was invalid and illegal, and describing the substantial harms it had caused and would continue to cause. A copy of that letter, which was sent to City Corporation Counsel Mara Georges and copied to Alderman Fioretti, is attached to the Verified Complaint as Exhibit E. Alderman Fioretti never responded to it. No City official has taken issue with the legal conclusion stated in that letter – that the plaintiffs have the legal right to proceed with the XO Condominium Development.

Denial of a Hearing on the Fioretti Revocation Ordinance

12.    The Zoning Committee scheduled a hearing and vote on the Fioretti Revocation Ordinance for its October 25, 2007 meeting. Formal notices were distributed by the Committee advising of a hearing on the proposed ordinance and inviting public participation. On or about October 18, 2007, the plaintiffs learned that Alderman Fioretti had requested that the Committee defer indefinitely any action on the Fioretti Revocation Ordinance.   Nonetheless, the plaintiffs appeared at that hearing, opposed any deferral and were prepared to explain their vested right to complete the Development and to ask the Committee to reject the Fioretti Revocation Ordinance. At the October 25 meeing, Alderman Banks, the Chairman of the Committee, informed the plaintiffs' representative that the request for deferral by Alderman Fioretti was binding on the Committee and, therefore, the Committee could not consider the Fioretti Revocation Ordinance.

13.    Plaintiffs understand and believe that in conversations with fellow Aldermen and other City officials, Alderman Fioretti has falsely stated that the plaintiffs have refused to contact or meet with him to discuss the Fioretti Revocation Ordinance and any concerns he may have with the PD. Plaintiffs believe that Alderman Fioretti made these false statements in an apparent

7

attempt to justify his refusal to withdraw his proposed ordinance and to justify his efforts to prevent the Committee on Zoning from holding its scheduled hearing on the proposed ordinance. Contrary to Alderman Fioretti's statements, the plaintiffs and their counsel have repeatedly contacted Alderman Fioretti to attempt to discuss the XO Condominium Development, both before and after he proposed the Fioretti Revocation Ordinance. Alderman Fioretti has been largely unresponsive, with the exception of a single preliminary meeting he attended with the plaintiffs' zoning attorney in early October 2007. At the conclusion of that meeting, Alderman Fioretti agreed to contact the zoning attorney again to discuss a possible resolution of the issues raised by his proposed ordinance. He has not done so. Exhibit B to the Verified Complaint accurately summarizes occasions on which the plaintiffs and their representatives have unsuccessfully attempted to discuss the Fioretti Revocation Ordinance with Alderman Fioretti

## DISCUSSION

14.    The standards for granting injunctive relief are well-established and warrant relief on the facts presented in this case. A plaintiff must demonstrate that (1) it has a protectable right; (2) it will suffer irreparable injury if injunctive relief is not granted; (3) its remedy at law is inadequate; and (4) there is a likelihood that it will succeed on the merits. Klaeren v. Village of Lisle, 202 Ill. 2d 164, 177, 781 N.E.2d 223, 230 (2002). In addition, the court must weigh the balance of harms that will result from the granting or denying of such relief. Save the Prairie Soc. v. Greene Development Group, Inc., 323 Ill.App.3d 862, 871, 752 N.E.2d 523, 531 (1st Dist. 2001). Preliminary injunctive relief is appropriate to remedy a violation of a party's due process rights. See Klaeren, 202 Ill. 2d at 187, 781 N.E.2d at 236. Plaintiffs meet all of the requirements for injunctive relief.

A.    PLAINTIFFS HAVE A PROTECTABLE RIGHT TO A HEARING.

8

15. The plaintiffs have a protectable right to a prompt hearing before the Zoning Committee under the due process clauses of the United States and Illinois Constitutions. U.S. Const. amend. XIV, § 1; Ill. Const. art. I, § 2. Procedural due process requires that a government provide notice and a hearing before depriving a person of a property or liberty interest. Warren v. City of Athens, 411 F.3d 697, 708 (6th Cir. 2005). Additionally, "a substantive due process violation occurs when an arbitrary and capricious action deprives an individual of a constitutionally protected property interest." Warren, 411 F.3d at 707 (citing Nectow v. City of Cambridge, 277 U.S. 183, 187-88 (1928) (holding that courts should reverse zoning decisions that are "a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare")). See also Kennedy v. City of Evanston, 348 Ill. 426, 428-29, 181 N.E. 312, 313 (1932) ("The owner of property has a constitutional right to make any use of it he desires, so long as he does not endanger or threaten the safety, health, comfort, or general welfare of the people."). Accordingly, the plaintiffs can establish a due process claim by establishing (1) that they have a protectable property interest; (2) that Alderman Fioretti has taken action that deprives them of that interest; and (3) that they have been denied a hearing (procedural due process) or that the Alderman's actions are arbitrary and capricious (substantive due process).

16. Here, the plaintiffs have a protectable property interest in constructing the XO Condominium Development as previously approved by the City. Because the introduction and pendency of the Fioretti Revocation Ordinance effectively deprives the plaintiffs of that property interest, procedural due process requires that they be given a hearing. Alderman Fioretti's indefinite deferral of Zoning Committee action on that invalid ordinance is arbitrary and

capricious and materially harms the plaintiffs' protected property interest. Therefore, that deferral violates the plaintiffs' substantive due process rights.

The Plaintiffs Have a Clearly Recognized Protectable Property Interest in
Developing the Property Consistent With its Underlying Zoning and the PD.

17.    The plaintiffs have a clearly recognized property right to develop the Property consistent with the underlying zoning and the detailed PD approved by the City. For purposes of the Due Process Clause, property rights are defined by state law. Lee v. City of Chicago, 330 F.3d 456, 469 (7th Cir. 2003); Yu v. Clayton, 147 Ill. App. 3d 350, 358, 497 N.E.2d 1278, 1284 (1st Dist. 1986). Under Illinois law, a property owner who makes substantial expenditures in good-faith reliance on existing zoning or city approval acquires a vested right to develop his or her property consistent with that zoning or approval. See 1350 Lake Shore Assoc. v. Healey, 223 Ill. 2d 607, 615, 861 N.E.2d 944, 950 (2006); Furniture L.L.C. v. City of Chicago, 353 Ill. App. 3d 433, 437-38, 818 N.E.2d 839, 843-44 (1st Dist. 2004). In Pioneer Trust & Savings Bank v. County of Cook, 71 Ill. 2d 510, 522-23, 377 N.E.2d 21, 26 (1978), the Illinois Supreme Court explained the acquisition of vested rights as follows:

> [W]here there has been a substantial change of position, expenditures or incurrence of obligations made in good faith by an innocent party under a building permit or in reliance upon the probability of its issuance, such party has a vested property right and he may complete the construction and use the premises for the purposes originally authorized, irrespective of subsequent zoning or a change in zoning classifications.

Therefore, the appropriate inquiry in any vested rights determination is (1) which expenditures or obligations were undertaken in good-faith reliance on the probability of City approval and (2) are those "good faith" expenditures or obligations substantial.

18.    A party's expenditures are in good-faith reliance on the probability that a certificate or permit will issue if – as in this case – they are incurred at a time when the

property's zoning permits the intended use.  Furniture L.L.C., 353 Ill. App. 3d at 437, 818

N.E.2d at 843.  Expenditures may no longer be considered made in good faith for purposes of a

vested rights determination once it becomes unreasonable to expect continued city approval, but

that does not occur – at the earliest – until the actual introduction of a proposed amendment to

the zoning classification that would not allow the planned construction.   1350 Lake Shore

Assoc., 223 Ill. 2d at 622, 861 N.E. 2d at 954.  Because the underlying zoning has always

allowed for the plaintiffs' intended use – the construction of the XO Condominium Development

– all expenditures, obligations and changes in position incurred by the plaintiffs were made in

good faith, at all times prior to the July 19, 2007 introduction of the Fioretti Revocation

Ordinance.  Plaintiff's expenditures and obligations already amounted to millions of dollars on

the day the Fioretti Revocation Ordinance was introduced.

19.     There can be no question that the plaintiffs' change in position prior to July 19,

2007 was substantial – far more direct and substantial than in other cases that have upheld vested

rights of developers.  Here, plaintiffs incurred over $19 million dollars in bank debt, personally

guaranteed by plaintiffs Keith Giles and Jerry Karlik.  They expended over $13 million for the

acquisition of the largest of the parcels comprising the Property, and obligated themselves in an

amount in excess of $5 million for the purchase of the remaining parcels.  They expended or

obligated themselves in an amount in excess of $5.2 million for architectural engineering fees, in

excess of $3.2 million for lease buy-out and relocation fees to existing tenants of the Property,

and in excess of $2.5 million in marketing and advertising expenses.  In addition, plaintiff 1712

South Prairie LLC entered into nearly 200 contracts for the purchase of condominium units with

third-parties.

20.    Under any measure, this is a substantial – indeed massive – change in position. Courts have found that far less qualified as "substantial expenditures" sufficient to establish a landowner's vested rights. In a recent case against the City, the Appellate Court for the First District held that a total of $900,000 spent by the owner to acquire property and on architectural fees was sufficient to vest the owner's rights to build a high rise residential tower and retail development. Furniture L.L.C., 353 Ill. App. 3d at 442-43, 818 N.E.2d at 847 (citing other cases in which expenditures of $44,100, $96,000, $71,400 and $125,000 were found sufficient). The Appellate Court's finding of vested rights in the Furniture L.L.C. case is controlling precedent in the present case. In addition to incurring exponentially greater expenses, the plaintiffs here have advanced their development well beyond the project in that case, which was still at the conceptual design stage and had not been taken to market. See id. at 435, 818 N.E. 2d at 842. Moreover, the owner/developer in Furniture L.L.C. had nothing as firm as a formal City-approved Plan of Development on which it relied. In every conceivable way, the plaintiffs' claim to vested rights in the present case is far superior to the claim upheld by the Appellate Court in Furniture L.L.C. Accordingly, under Illinois law the plaintiffs have a vested and protectable property right to complete the XO Condominium Development as planned.

21.    In addition to their vested rights, the plaintiffs have a legal right to complete the Development under the related doctrine of equitable estoppel. Under Illinois law, if the affirmative act of a public body induces a property owner substantially to change his or her position in good-faith reliance, the governmental body is estopped from rescinding its action. Drury Displays, Inc. v. Brown, 306 Ill. App. 3d 1160, 1165, 715 N.E.2d 1230, 1234 (5th Dist. 1999). Here, in reasonable reliance on the affirmative approvals of the PD by the Plan Commission, Zoning Committee and City Council, the plaintiffs substantially changed their

position by, among other things, incurring substantial debt, obligating themselves for millions of dollars in marketing expenses and architectural engineering fees, and entering into purchase contracts with approximately 200 buyers. Accordingly, principles of equitable estoppel provide further support for the plaintiffs' legal property right to carry through and complete the Development as approved.

Alderman Fioretti's Actions Have
Deprived the Plaintiffs of Their Property Rights.

22.     By introducing the Fioretti Revocation Ordinance and then indefinitely deferring any further action on it, Alderman Fioretti has deprived the plaintiffs of their property right to complete the XO Condominium Development. As soon as that Ordinance was proposed, it was immediately reported in the press and a cloud of uncertainty was cast over the Development. In addition to harming sales and market standing, the cloud has prevented the plaintiffs from advancing their negotiations with construction contractors (who are reluctant to spend time on a project that they now fear the City will not allow to be built) and has served as an absolute bar to any further financing. Lenders have refused to extend additional credit, including the necessary construction financing, and will continue to refuse until the Fioretti Revocation Ordinance is withdrawn, rejected by the Zoning Committee or City Council, or held invalid by a court. Accordingly, as long as the Ordinance remains pending before the Committee, the plaintiffs are deprived of their property interest in completing the XO Condominium Development

Further Delay Before the Zoning Committee
Violates the Plaintiffs' Procedural Due Process Rights.

23.     The due process clause requires that a property owner be afforded notice and a hearing before a property deprivation occurs or, in certain circumstances, at least within a reasonable period of time after the deprivation. Siebert v. Severino, 256 F.3d 648, 659 (7th Cir.

2001) ("Absent exigent circumstances, or a random or unforeseen act, a pre-deprivation procedure is generally required before the government may deprive a person of their property"); Magett v. Cook County Sheriff's Merit Board, 282 Ill. App. 3d 282, 289, 669 N.E.2d 616, 621 (1st Dist. 1996) ("At some point, a delay in adjudication [of property deprivation] will become a constitutional violation"). Here, the plaintiffs have suffered a property deprivation but have been provided with no hearing. In light of Alderman Fioretti's indefinite deferral of his proposed ordinance, there is no reasonable prospect that the plaintiffs will receive a hearing in the near future, if at all unless this Court acts. This is a patent violation of the plaintiffs' procedural due process rights that can and should be rectified by Court order.

Alderman Fioretti's Indefinite Deferral of Action on His Invalid Proposed Ordinance is
Arbitrary and Capricious and Violates the Plaintiffs' Substantive Due Process Rights.

24.    Alderman Fioretti's actions also violate the plaintiffs' substantive due process rights. This is a classic case in which plaintiffs are being deprived of a property interest by an exercise of government power that is arbitrary and capricious and bears no "substantial relation to the public health, the public morals, the public safety or the public welfare." Nectow 277 U.S. at 187-88. Alderman Fioretti's introduction and indefinite deferral of the Fioretti Revocation Ordinance is an arbitrary and capricious exercise of power.

25.    The Fioretti Revocation Ordinance is clearly illegal and unenforceable under Illinois' vested rights and equitable estoppel doctrines (see ¶¶ 17-21, above). Alderman Fioretti, an experienced lawyer who plaintiffs understand spent a portion of his career representing the City, knew or reasonably should have known that to be the case when he introduced the Ordinance. Likewise, he reasonably should have known that the introduction of such an

14

ordinance would harm the plaintiffs and effectively deprive them of their protectable and vested interest and right to proceed with the XO Condominium Development.

26.    Even if Alderman Fioretti was not aware of these facts at the time he introduced his Ordinance, the plaintiffs promptly and repeatedly informed him of the controlling Illinois case law and the facts that establish their vested rights and demonstrate the deprivation to their rights caused by the Ordinance. See Exhibits E and A to the Verified Complaint (July 25, 2007 letter to Mara Georges, Corporation Counsel, copied to Alderman Fioretti, and October 17, 2007 letter to Alderman William J.P. Banks, chairman of the Zoning Committee, also copied to Alderman Fioretti.). Faced with this information, rather than withdrawing the invalid and unenforceable ordinance, or allowing it to proceed to the scheduled vote before the Zoning Committee, Alderman Fioretti caused the Committee on October 25, 2007 indefinitely to defer action. This has locked in place an effective, but unlawful, bar to construction of the Development. Were the Fioretti Revocation Ordinance to be passed by the Zoning Committee and enacted – which plaintiffs do not believe will occur if the Committee is permitted to vote on it – the plaintiffs could and would seek an immediate judicial determination that it is void and invalid. Alternatively, if the Fioretti Revocation Ordinance were rejected by the Zoning Committee, the cloud it has placed on the Development, which has prevented the plaintiffs from proceeding, would be removed. By deferring Committee consideration, however, Alderman Fioretti has prevented either outcome.

27.    Alderman Fioretti's indefinite deferral of action on the Fioretti Revocation Ordinance is arbitrary and capricious. It provides no benefit to the public health, morals, safety or welfare. The public stands nothing to gain from the introduction of an invalid and unenforceable ordinance. It certainly retains no benefit from placing that ordinance in indefinite

15

suspension, preventing the Zoning Committee from reviewing and acting on the matter after it has given formal notice to the public that it intends to act on the proposal. The only consequence of Alderman Fioretti's deferral, and his only apparent motivation, is to deny the plaintiffs their vested right to proceed with the XO Condominium Development. In the process, Alderman Fioretti's actions will deny the local economy a substantial influx of jobs and the City the tax revenue that the Development would create. The indefinite deferral of action on the Fioretti Revocation Ordinance violates the plaintiffs' substantive due process rights and should be enjoined.

B.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM

28.    There can be no question that the plaintiffs will suffer irreparable harm if injunctive relief is not granted. They are presently suffering such harm on a daily basis. As a preliminary matter, "[o]nce a protectable interest is established, irreparable injury . . . is presumed if the interest remains unprotected." A-Tech Computer Servs. v. Soo Hoo, 254 Ill. App. 3d 392, 400, 627 N.E.2d 21, 27 (1st Dist. 1993 ). As described in ¶¶ 17-21, above, the plaintiffs have a vested and protectable right to construct the XO Condominium Development as approved by the City.

29.    Furthermore, as described in ¶¶ 22-27, above, defendants' actions constitute a continuing violation of plaintiff's constitutional rights. That is sufficient to establish irreparable harm. See C.J. v. Department of Human Services, 331 Ill.App.3d 871, 891, 771 N.E.2d 539, 557 (1st Dist. 2002) ("a continuing violation of a constitutional right that cannot be adequately compensated with money, coupled with an inadequate remedy at law, constitutes a *per se* irreparable harm."); Campbell v. Miller, 373 F.3d 834, 840 (7th Cir. 2004) (finding that a party

can establish the irreparable harm element by demonstrating a violation of his constitutional rights.).

30.   In addition, the harm Alderman Fioretti is causing to the plaintiffs and the XO Condominium Development will be irreversible if not promptly stopped. The Plaintiffs will never be able to recover the sales and market momentum lost during the pendency of the Fioretti Revocation Ordinance without prompt judicial relief. Unless the cloud caused by the Ordinance is promptly removed, the plaintiffs will not be able to recreate the credit and construction contracting opportunities that have now been suspended. More dire, as there is no prospect that the cloud will ever be lifted without Court intervention, the plaintiffs ultimately could lose the entire project, as no development carrying $19 million in debt can survive in suspended animation indefinitely.

C. PLAINTIFFS LACK AN ADEQUATE LEGAL REMEDY

31.   The facts set forth above also establish the lack of an adequate legal remedy. Alderman Fioretti has denied the plaintiffs the normal recourse they would have through action by the Zoning Committee or City Council. As a result, at present there is no final Committee action rejecting the proposed ordinance or an enacted ordinance that plaintiffs could challenge by a declaratory judgment action. And even if the plaintiffs had the ability to bring a legal claim, the damages that Alderman Fioretti's actions are causing them – including harm to the plaintiffs' position in the market – are by their very nature not capable of being adequately compensated with money damages. If allowed to continue unchecked, defendants' actions will have a significant, long-term impact on the plaintiffs' business. Illinois courts recognize that the "loss of a competitive position is intangible, incapable of being measured." A-Tech Computer Servs. v. Soo Hoo, 254 Ill. App. 3d 392, 401, 627 N.E.2d 21, 27 (1st Dist. 1993). See also Cross Wood

17

Prods. v. Suter, 97 Ill. App. 3d 282, 286, 422 N.E.2d 953, 957 (1st Dist. 1981). Injuries such as the loss of customers and market position are, by their very nature, so variable that "damages are hard to assess with any degree of accuracy." A-Tech, 254 Ill. App. 3d at 401, 627 N.E.2d at 27. As such, there is no adequate remedy at law for the plaintiffs' damages. Id. (finding no adequate remedy at law when the plaintiff's harm was loss of competitive position).

D. LIKELIHOOD OF SUCCESS ON THE MERITS

32.    In order to show a likelihood of success on the merits, a party "need raise only a fair question at to the existence of the right claimed." McRand v. Van Beelen, 138 Ill. App. 3d 1045, 1050, 486 N.E.2d 1306, 1310 (1st Dist. 1985). The facts set forth in this Motion and in the Verified Complaint far exceed this standard.

E. BALANCE OF HARMS FAVORS ENTRY OF THE INJUNCTION

33.    The harms that the plaintiffs and the public would suffer if the narrow injunctive relief sought is not granted and the Fioretti Revocation Ordinance is allowed to pend indefinitely are substantial, and could include the complete failure of the Development. These strongly outweigh the harms, if any, that Alderman Fioretti and the members of the Zoning Committee will suffer if they are directed to proceed with a Committee hearing and vote on the Fioretti Revocation Ordinance at the November 20, 2007 meeting. The interests of the public also favor issuance of the injunction. There are approximately 200 individuals and families who desire to live in the XO Condominium Development and have entered into contracts to purchase units. These citizens have a significant interest in the entry of the injunction, which is necessary to allow the unimpeded completion of the Development. The real estate development community, and property owners in general, have an interest in the entry of the injunctive relief sought here. Denial of that relief sets a dangerous precedent for property owners, one that allows a single

alderman unilaterally to thwart a real estate project at this late stage of development, after City approval of a PD and after millions of dollars have been spent in reliance, with the owner allowed no recourse to assert its vested rights. If zoning approvals and express City authorizations are so tenuous that they can be effectively reversed by a single alderman, owners and developers will lack the certainty they need to proceed with substantial projects and development efforts in the City will suffer.

ACCELERATED DISCOVERY

34.    The plaintiffs will require discovery from the defendants in advance of the hearing on this motion. Such discovery is likely to include the deposition of Alderman Fioretti and documents relating to Alderman Fioretti's decision to introduce and then defer action on the Fioretti Revocation Ordinance. Pursuant to Illinois Sup. Ct. Rule 201(d), this Court may grant leave for the parties to initiate discovery at this time "for good cause shown." There is good cause to allow such discovery here, as the plaintiffs require it to protect their constitutional due process rights.

CONCLUSION

WHEREFORE, for the foregoing reasons, the plaintiffs request that this Court enter an order:

(a)    setting this motion for a hearing and decision before November 20, 2007; and

(b)    granting leave for the parties to commence discovery immediately, with relevant discovery to be completed sufficiently in advance of the hearing on this motion. Such discovery should include, but not be limited to, the deposition of Alderman Fioretti and production of document requests and materials relating to:

(i)    all communications between Alderman Fioretti and the plaintiffs;

(ii)    all communications between Alderman Fioretti and other alderman or City officials relating to the plaintiffs or the Development;

19

     (iii)    all communications between Alderman Fioretti and third-parties relating to the plaintiffs or the Development; and

     (iv)    all documents relating to the Fioretti Revocation Ordinance, including the Alderman's request to the Zoning Committee to defer action on that ordinance.

and at the conclusion of that hearing enter an order:

(c)    enjoining defendant Alderman Robert Fioretti from taking any further steps to prevent or delay the Zoning Committee or the City Council from holding a hearing and voting on the Fioretti Revocation Ordinance;

(d)    directing the defendant members of the Zoning Committee to hold a hearing and a vote on the Fioretti Revocation Ordinance at the Committee's next scheduled meeting, currently set for November 20, 2007; and

   (e) granting such other relief as the Court deems appropriate to protect plaintiffs' rights and to permit them to proceed with the development of the XO Condominium Development.

Dated: October 29, 2007

Respectfully submitted,

By: _____
One of the plaintiffs' attorneys

Michael L. Shakman
Daniel M. Feeney
Jennifer E. Smiley
MILLER SHAKMAN & BEEM LLP (90236)
180 N. LaSalle St. Suite 3600
Chicago, IL 60601
(312) 263-3700

**1**


COMING SOON
BlackBerry 8830 World Edition smartphone
TELL ME MORE   TELL ME WHEN   veri on wireless

## CHICAGOBUSINESS
POWERED BY CRAIN'S

Print Story | Close Window     Printed from ChicagoBusiness.com

# Proposed zoning change threatens South Loop project

By Alby Gallun
July 20, 2007

(Crain's) — Newly elected 2nd Ward Alderman Bob Fioretti has introduced a zoning change that would shrink a controversial South Loop condominium project, potentially triggering a lawsuit from the developer.

Coming three months after Mr. Fioretti defeated incumbent Madeline Haithcock in a runoff election, the move suggests that developers will face closer scrutiny than they have in the ward, an area that has added thousands of condos over the past several years.

During the campaign, Mr. Fioretti accused Ms. Haithcock of being too cozy with developers, and he refused to accept donations from them.

Now, the alderman is trying to undo a zoning change that the City Council passed last fall with his predecessor's support.

That move allowed Kargil Development LLC to build the X/O Condominiums, a 490-unit project at 1712 S. Prairie Ave. Plans call for two towers, one 450 feet tall and the other 310 feet-much bigger structures than permitted under the old zoning.

Kargil's X/O Condominium project

Mr. Fioretti introduced a measure at Thursday's City Council meeting that would "downzone" the property to allow towers of just 225 feet, effectively restoring the original zoning.

"Architecturally it's a beautiful structure but it just doesn't belong there," he says. "I want to make sure we have good balanced development throughout the ward."

Kargil Principal Keith Giles says he's "perplexed and dismayed" by the change, calling it "unethical and wrong."

"I think it sends a horrible, horrible message to the development community when within weeks of being elected he can just change the zoning because he has some opinion about what's right and what's wrong there," says Mr. Giles, who hasn't seen Mr. Fioretti's proposal.

A spokeswoman for the Department of Planning and Development, which signed off on the first zoning change,

didn't have an immediate response to the proposal.

Designed by renowned Chicago architect Lucien Lagrange, X/O's contemporary glass towers would sit across the street from the landmark Glessner House in the Prairie Avenue Historic District. Though two neighborhood organizations supported the project, a block of residents formed a third group, the Prairie District Neighborhood Alliance, last year to fight the development, arguing that it would overwhelm the neighborhood.

The condos have sold well, with buyers signing contracts for about 200 units valued at about $100 million, Mr. Giles says. X/O is expected to be worth about $270 million when it's sold out.

Mr. Giles estimates that the downzoning proposal would reduce the size of the project by about 100 units, assuming City Council passes it and it withstands legal scrutiny.

Asked if he plans to sue over the move, Mr. Giles says: "I'm going to confer with my lawyers obviously, but this project's moving forward. We have spent millions and millions of dollars on this project. There is no turning back now."

Courts have generally ruled for developers in downzoning cases if the developers can establish that they had a "vested right" to build by spending a significant amount of money on a project before the city changed the zoning.

It's a familiar concept to Mr. Fioretti, a lawyer who once worked on a high-profile case arguing against a proposed condo tower on Lake Shore Drive in the Gold Coast.

"I'm not one that likes to see litigation," he says, "but I think that everybody believes that this is an inappropriate structure at this location."

2

## Living green

Tips for sustainable living
Metropolis, 13

### Bikes from beyond

Ghost bikes popping up around Chicago 3

### Bio-fueled vehicle

Field Museum develops eco-smart car 5

### Green curriculum

Columbia College architecture programs have new focus 6

### Eco-smart and fashion friendly

Green boutique to open in West Loop 7

Police Blotter .......... 10
Viewpoints .......... 12
Metropolis .......... 13
Calendar .......... 17
Chicago Journal Homes .... 40

Online at
chicagojournal.com.




# on the go

## Car sharing an easy alternative

BY HAYLEY GRAHAM
*Editor*

After escaping the suburbs and leaving the comfort of driving behind, I realized that even though I primarily rely on public transportation, sometimes a car just makes life easier. I recently turned to car sharing, a convenient, affordable and eco-friendly way to get behind the wheel when I need to...

Thousands have joined the I-GO car sharing program since its 2002 inception. Both programs offer an environmentally friendly alternative to owning. Both programs share the similar concept of having a network of vehicles at secured locations citywide. Reservations can be made for as little as an hour at a time. And they offer members...

Photo by Katie Sheridan

X/O Condominiums

Rendering courtesy of Lucien LaGrange

# Ordinance could downsize X/O

BY HAYLEY GRAHAM
*Editor*

## Fioretti introduces zoning change

Second Ward Alderman Bob Fioretti introduced an ordinance that would downsize the controversial X/O Condominiums development in the Prairie District, but the developer plans to move forward.

The ordinance would counteract a zoning change passed last fall with the backing of incumbent Alderman Madeline Haithcock, who lost to Fioretti in an April runoff election. The change cleared any legal roadblocks for Kargil Development LLC to build the 490-unit development at 1712 S. Prairie.

X/O Condominiums would have two glass towers, one 450 feet tall and the other at 310 feet, but if the zoning change passes they would only be allowed to reach 225 feet.

"We're just bringing it back down to the height of the buildings in the surrounding area," Fioretti said. "It's the preservation of the architectural style here."

The ordinance was introduced at City Council's meeting on July 19, and would likely go

See X/O on Page 8





# 5.00%
## APY*

r Special CD

Landmark 8 Month CD

# 5.30%  5.05%
## APY**  APY**

Debit Card • FREE Bill Pay • Drive-Thru ATM

## Lakeside Bank
www.LakesideBank.com

Conveniently Located!

UIC/Near West

Board of Trade

North Loop

South Loop

Chinatown/Pilsen

Lakeview/Lincoln Park

FDIC



Proposed zoning change threatens X/O Condominiums.

Rendering courtesy of Lucien Lagrange

# X/O

*Continued from page 1*

before the zoning committee for a hearing in September or October, Fioretti said.

Fioretti said the developer could potentially argue against the proposed ordinance saying that they have property rights.

"I don't think anybody can say property rights have vested," Fioretti said.

Kargil Principal Keith Giles said he would not want to have to take legal action against the city, adding that he expects it will not be necessary.

"An ordinance repealing the planned development would not be legally enforceable," Giles said. "We are moving forward."

Giles said that during the eight months of the presale phase they have already sold 200 units with about $100 million in revenue. He also added that many of those buyers live in other areas of the South Loop.

"We have been prominent developers in the South Loop, and by far it has been well received by the public at large," Giles said.

Steve Ward, the director of planning and development on the board of the Greater South Loop Association, said that after meeting with the developers on multiple occasions, finding them very responsive and hearing virtually no opposition from residents present at the meetings, the GSLA wrote two letters of support for X/O.

"We try to maintain a vision for the greater South Loop and it's becoming more challenging now as more people move in and they want things to remain the way they are," he said.

Ward said taller, thinner developments, like X/O, would help create more density in the South Loop, which would bring in more businesses.

"If we don't maximize that potential, we'll be doing a disservice to the city of Chicago and greater society," Ward said.

The contemporary design of the building, which was designed by the prominent Chicago architect Lucien Lagrange, has been a primary concern of Prairie District residents, who argue that it doesn't fit in with the historic neighborhood. X/O would sit across from Glessner House a landmark.

"It being a historic district doesn't mean you have to duplicate historic buildings," Giles said. "We are building a unique, architecturally significant building."

Tina Feldstein, board president of the Prairie District Neighborhood Alliance, the community organization formed to fight the X/O development, said the historic neighborhood is not the right location for the towers.

"We're not against the design or the developer," she said. "It's not in keeping with the character and scale of the neighborhood. It just doesn't make sense."

Feldstein said the PDNA, which represents about 1,000 residents in the neighborhood, fully supports the alderman and the proposed ordinance.

"We finally have an alderman that represents what the residents are wanting ... the residents who will be affected by the development," Feldstein said.

However, Ward said the GSLA believes that the X/O development has the potential to become the Glessner House of its generation, adding that the Glessner House was a contemporary design when it was built and had been opposed by many of its influential neighbors.

"In general we think it's a very appropriate project for that site," Ward said.

CONTACT: hgraham@chicagojournal.com

3

# New aldermen in nuke mode



**REAL ESTATE** | Armed with voter mandate, ready to zap projects North and South

### DAVID ROEDER
droeder@suntimes.com

Chicago developers, so used to getting what they want out of City Hall, are suddenly playing by different rules. Newly minted aldermen from the two wards that include the city's core in the last two weeks have moved to spike controversial projects.

The aldermen, **Robert Fioretti** (2nd) and **Brendan Reilly** (42nd), beat incumbents who many believed had gotten too cozy with developers. Fioretti and Reilly so far have shown that activist community groups will have a greater say in what gets built. A politically sedated town could use the democracy, but the aldermen also are testing the limits of property rights.

Fioretti said he will ask the City Council to rescind a zoning ordinance that allows **Kargil Development Partners LLC** to build condominium towers of 45 and 33 stories at 1712 S. Prairie, next to a landmark district. Neighbors in the booming part of the Near South Side are angry about the high-rises. They are designed by prominent architect **Lucien Lagrange**, but some call the towers Three Mile Island because of a similarity to the notorious nuclear plant.

The ordinance has been in place around a year. Kargil partner **Keith Giles** said a marketing effort since its passage has netted sales contracts on about 200 units, or 40 percent of the total, for $100 million.

What's next if the Council goes along with Fioretti? Giles doesn't think it will get that far because he's looking to the Daley administration for help. "I think the Law Department will act prudently" and convince the Council not to back Fioretti, Giles said. "The city doesn't want this litigation, we believe."

Yes, Giles said he's prepared to sue for his right to build. Zoning attorney **Jack Guthman**, who represents major developers but not Giles, cautioned the courts might be the last resort in this matter.

Guthman said longstanding practice in the Council indicates other aldermen will go along with Fioretti. "What Bob Fioretti has done is absolutely sending the wrong message to developers around the country who need certainty and predictability" in zoning, Guthman said.

Reilly on July 10 came out against demolition of the old Lakeshore Athletic Club at 850 N. Lake Shore





Will the real Three Mile Island please stand up? (Hint: It's the top one.)

Drive, although that's the basis of **Fifield Cos.**' proposed $41 million acquisition of the property. The building is not a landmark, and Fifield's plan to build no taller than the current 19-story building is consistent with the zoning.

Fifield Senior Vice President **Alan Schachtman** has tried jawboning in response. He said he met with Reilly to press the case that no renovation is feasible for a 1927 building that has small rooms last used as a dormitory by Northwestern University. Schachtman wants a change of heart, something that could cost Reilly goodwill with a constituency still getting to know him.

Schachtman wouldn't discuss further strategy, but insiders believe Fifield is more likely to walk from its sales contract than drag the city to court.

Asked if developers will have a harder time with aldermen, Schachtman said, "I don't think anyone can draw any conclusions from a couple of months of a new City Council."

Maybe not. But just in case, developers should work on their song-and-dance routines to impress the neighbors before they can even take their next project to the market.

That, or build someplace where the neighbors are passive. I know one: the Loop!

## CERTIFICATE OF SERVICE

The undersigned attorney, upon oath, hereby certifies that a copy of the foregoing **Plaintiffs' Emergency Motion for Preliminary Injunction and Accelerated Discovery** and **Notice** thereof, was served upon the named party(ies) listed below, addressed aforesaid, **via messenger service,** on the 29th day of **October, 2007.**

**Mara S. Georges, Esq.**
**Corporation Counsel – Law Dept.**
**CITY HALL**
**121 North LaSalle Street**
**Room 600**
**Chicago, IL  60602**

**Honorable Robert Fioretti**
**CITY HALL**
**121 North LaSalle Street**
**Office 02**
**Chicago, IL 60602**

Michael L. Shakman, Esq.
Daniel M. Feeney, Esq.
MILLER SHAKMAN & BEEM LLP
180 North La Salle Street - Suite 3600
Chicago, IL 60601
Atty. No. 90236
Telephone:    (312) 263-3700
Facsimile:    (312) 263-3270

# Exhibit F

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| 1712 SOUTH PRAIRIE LLC, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| V. | ) | Case No. 07 CH 30987 |
| | ) | |
| HONORABLE ROBERT FIORETTI, | ) | |
| Individually and in his Official Capacity;    et al. | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF KEITH GILES

Keith Giles, being duly sworn, states as follows:

1.    I am over the age of 18 and currently a resident of Illinois. I have personal knowledge of the matters set forth in this affidavit.

2.    I am a plaintiff in the above-captioned action. In addition, I am a member and principal of plaintiffs 1712 South Prairie LLC and Kargil Development Partners LLC. I submit this affidavit in support of the plaintiffs Motion for Preliminary Injunction and Accelerated Discovery (the "Motion").

3.    I have reviewed the facts recited in the Motion. Those statements are true and correct. Where a statement is stated based on belief, I believe such statement to be true and correct.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes same to be true.

Dated: October 29, 2007

_____
Keith Giles

EXHIBIT
F

## CERTIFICATE OF SERVICE

The undersigned attorney, upon oath, hereby certifies that a copy of the foregoing **Affidavit of Keith Giles**, was served upon the named party(ies) listed below, addressed aforesaid, **via messenger service**, on the **29th** day of **October, 2007.**

**Mara S. Georges, Esq.**
**Corporation Counsel – Law Dept.**
**CITY HALL**
**121 North LaSalle Street**
**Room 600**
**Chicago, IL  60602**

**Honorable Robert Fioretti**
**CITY HALL**
**121 North LaSalle Street**
**Office 02**
**Chicago, IL 60602**

Michael L. Shakman, Esq.
Daniel M. Feeney, Esq.
MILLER SHAKMAN & BEEM LLP
180 North La Salle Street - Suite 3600
Chicago, IL 60601
Atty. No. 90236
Telephone:     (312) 263-3700
Facsimile:     (312) 263-3270

# Exhibit G

Order                                                        CCG N002-300M-2/24/05 (                    )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

1712 S. Prairie   LLC   et al.

v.                                                   No. 07 CH 30987

Ald. Robert Fioretti  et al.

Page 1 of 2

## ORDER

This matter coming to be heard on plaintiffs' Emergency Motion for Preliminary Injunction and Accelerated Discovery, notice given and the parties present by counsel (with the exception of Ald. Fioretti, in his individual capacity), it is hereby ordered that:

(1) The Appearing Defendants (i.e. all defendants other than Ald. Fioretti, in his individual capacity) have reserved the right to remove to Federal Court;

(2) Appearing Defendants have until Nov. 13 to respond to the Emergency Motion and to answer or otherwise plead;

(3) Plaintiffs have until Nov. 15, 2007 to reply in the Emergency Motion and respond to any motion to dismiss filed by defendants;

(4) Defendants shall have until Nov. 16, 2007 a.m. to file a reply in any motion to dismiss.

(5) The Motion to Dismiss of Defendants is set for hearing on Nov. 16, 2007 at 1:30 p.m.

Atty. No.: 40230                          ENTERED:

Name: Dan Feeney  Miller Shakman + Beam LLP

Atty. for: Plaintiffs                     Dated:

Address: 180 N. LaSalle  Suite 3600

City/State/Zip: Chicago, IL 60601

Telephone: 312/263-3700

EXHIBIT
G

Judge                                            Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

Order                                        CCG N002-300M-2/24/05 (                    )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

1712 S. Praicio LLC et al.

v.                              No. 07 CH 30987

Ald. Robert Finetti et al.

### ORDER

Cont. - Page 2 of 2

(6) Plaintiffs are granted leave to ~~pla~~ serve Alderman Finetti via a special proxess server.

Atty. No.: 50320

Name: Don Fearing

Atty. for: Plaintiffs

Address: 130 N. LaSalle Sta. 1600

City/State/Zip: Chicago IL 60604

Telephone: 312/263-3700

ENTERED:

Dated: _____

ENTERED
JUDGE KATHLEEN M. PANTLE · 1775
OCT 30 2007
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

Judge                                        Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

# Exhibit H

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

FILED

| | |
|---|---|
| 1712 SOUTH PRAIRIE LLC, et al., | ) 2007 NOV -6 PM 4: 14 |
| | ) |
| Plaintiffs, | ) DOROTHY BROWN |
| | ) CLERK OF THE CIRCUIT |
| | ) OF COOK COUNTY, IL |
| vs. | ) No. 07 CH 30987 |
| | ) |
| HONORABLE ROBERT FIORETTI, et al., | ) |
| | ) |
| Defendants. | ) |

## NOTICE OF MOTION

**TO:**   **Mardell Nereim, Bill Aguire, Mike Forti, Chief Asst. Corporation Counsel,
Constitutional & Commercial Litigation Division, City of Chicago – Law Dept.,
30 North LaSalle Street, Room 1230, Chicago, IL 60602
Honorable Robert Fioretti, City Hall, 121 North LaSalle Street, Room 300,
Office 02, Chicago, IL 60602**

          **PLEASE TAKE NOTICE** that on the 8ᵗʰ [13] day of November, 2007, at **9:30 a.m.,** or as
soon thereafter as counsel may be heard, we shall appear before the **Honorable Kathleen
Pantle,** or any other judge sitting in her stead, in the courtroom usually occupied by her in **Room
2410** of the Richard J. Daley Center in Chicago, Illinois, and shall then and there present the
attached **Plaintiffs' Motion to Strike Briefing Schedule and for Other Relief,** a copy of which
is hereby served upon you.

                    Respectfully submitted,

                    By: _____
                         Attorneys for Plaintiffs

Michael L. Shakman
Daniel M. Feeney
Jennifer E. Smiley
MILLER SHAKMAN & BEEM LLP
180 North La Salle Street - Suite 3600
Chicago, IL 60601
Atty. No. 90236
Telephone:   (312) 263-3700
Facsimile:   (312) 263-3270



RECEIVED
CORPORATION COUNSEL
07 NOV -6 PM 4: 35
BY



EXHIBIT
**H**

## CERTIFICATE OF SERVICE

The undersigned attorney, upon oath, hereby certifies that a copy of the foregoing **Plaintiffs' Motion to Strike Briefing Schedule and for Other Relief and Notice** thereof, was served upon the named party(ies) listed below, addressed aforesaid, **via messenger service,** on the 6th day of **November, 2007.**

> **Mardell Nereim**
> **Bill Aguire**
> **Mike Forti**
> **Chief Asst. Corporation Counsel**
> **Constitutional & Commercial Litigation Division**
> **CITY OF CHICAGO – LAW DEPT.**
> **30 North LaSalle Street**
> **Room 1230**
> **Chicago, IL 60602**
>
> **Honorable Robert Fioretti**
> **CITY HALL**
> **121 North LaSalle Street**
> **Room 300, Office 02**
> **Chicago, IL 60602**

Michael L. Shakman
Daniel M. Feeney
Jennifer E. Smiley
MILLER SHAKMAN & BEEM LLP
180 North La Salle Street - Suite 3600
Chicago, IL 60601
Atty. No. 90236
Telephone:    (312) 263-3700
Facsimile:    (312) 263-3270

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| 1712 SOUTH PRAIRIE LLC, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| V. | ) |
| | ) |
| HONORABLE ROBERT FIORETTI, et al. , | ) |
| | ) |
| Defendants. | ) |

Case No. 07 CH 30987

## PLAINTIFFS' MOTION TO STRIKE BRIEFING SCHEDULE
## AND FOR OTHER RELIEF

Plaintiffs 1712 South Prairie LLC, Kargil Development Partners LLC, Keith Giles and Jerry Karlik respectfully request that this Court enter an order striking the pending briefing schedule and hearing date, and continuing this matter for status to November 21, 2007 or such date thereafter as is available to the Court. In support of this motion, Plaintiffs state as follows:

1.     On October 30, 2007, the parties appeared before the Court on Plaintiffs' Emergency Motion for Preliminary Injunction and Accelerated Discovery (the "Motion"). On that date, the Court entered an Order setting a briefing schedule and hearing date on the Motion.

2.     Among other relief, the Motion seeks an order from the Court directing the defendant members of the City of Chicago Zoning Committee to hold a hearing and a vote on the Fioretti Revocation Ordinance at the Committee's next scheduled meeting on November 20, 2007.

3.     Since October 30, counsel for the Plaintiffs and the City of Chicago have conferred in an attempt to resolve the issues raised by the Motion. Counsel for the City of Chicago have now represented to Plaintiffs' counsel that the Chairman of the Zoning Committee has pledged to place the Fioretti Revocation Ordinance on the agenda for the Committee's

November 20, 2007 meeting and to call for a vote on that proposed ordinance at that time, regardless of any deferral request by Alderman Fioretti.

4.    Given this representation from counsel for the City of Chicago, it is appropriate to strike the briefing schedule and hearing date set for the Motion, and to continue this matter to November 21, 2007 or such date thereafter as is available to the Court.

5.    Counsel for the City of Chicago have informed Plaintiffs' counsel that they do not oppose this motion.

WHEREFORE, Plaintiffs respectfully request that the Court enter an order:

(a)    Striking the briefing and argument dates set forth in the Court's Order of October 30, 2007;

(b)    Entering and continuing Plaintiffs' Motion for Preliminary injunction and accelerated discovery to November 21, 2007;

(c)    Setting this matter for status on November 21, 2007, or the nearest available date, at a time amenable to the Court; and

(d)    Granting such further relief as the Court deems just and proper.

Dated: November 6, 2007

Respectfully submitted,

By: _____
One of the plaintiffs' attorneys

Michael L. Shakman
Daniel M. Feeney
Jennifer E. Smiley
MILLER SHAKMAN & BEEM LLP (90236)
180 N. LaSalle St. Suite 3600
Chicago, IL 60601
(312) 263-3700

2

# Exhibit I

Order             CCG N002-300M-2/24/05 (            )

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

1712 South Prairie LLC, et al.

v.

No. 07 CH 30987

Fiore th, et al.

**AGREED ORDER**

This matter coming to be heard on Plaintiffs' Motion to Strike Briefing Schedule and for Other Relief, and the Court being fully advised in the premises,

IT IS HEREBY ORDERED:

(1) Plaintiffs' motion is granted, and the briefing schedule set forth in the Court's Order of October 30, 2007 is hereby stricken;

(2) The matter is set for status on November 21, 2007 at 10:00 AM; and

(3) Plaintiffs' Motion for Preliminary Injunction and Accelerated Discovery is entered and continued to 11/21/2007.

EXHIBIT I

Atty. No.: 90909
Name: William Macy Aguiar (City)
Atty. for: City of Chicago (D)
Address: 30 N. LaSalle St, Suite 1230
City/State/Zip: Chicago, IL 60602
Telephone: (312) 744 4216

ENTERED:

Dated: _____

ENTERED JUDGE KATHLEEN M. PANTLE - 1775
NOV 13 2007
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

Judge          Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

**CERTIFICATE OF SERVICE**

I, William Macy Aguiar, an attorney of record for the Defendant, hereby certify that on

November 29, 2007, l served a copy of the foregoing **Notice of Removal** on the attorneys for the

plaintiffs listed below by hand delivery:

> Michael L. Shakman
> Daniel M. Feeney
> MILLER SHAKMAN & BEEM LLP
> 180 N. LaSalle Street, Suite 3600
> Chicago, IL 60601

William Macy Aguiar